**In the Matter of YUBA CONSOLIDATED INDUSTRIES, INC., Debtor.**

No. 64013.

United States District Court
N. D. California.

Nov. 23, 1966.

Goldstein, Barceloux & Goldstein, by Burton J. Goldstein, Ralph Golub, San Francisco, Cal., for trustee and his counsel.

Walter Hoffman, Athearn, Chandler & Hoffman, Attys., for Judson Steel, San Francisco, Cal., for applicant.

Francis J. Quittner, Los Angeles, Cal., Quittner, Stutman, Treister & Glatt, Los Angeles, Cal., Richard Keating, and Dennis E. Kinnaird, Keatinge & Sterling, Los Angeles, Cal., for debtor.

Orrick, Dahlquist, Herrington & Sutcliffe, by Christopher M. Jenks, San Francisco, Cal., for Mr. Cadenasso.

Ellis, Matthews & Levy, by Harold L. Levy, Sidney Rudy, San Francisco, Cal., for debentureholders' Committee and Beach C. Soule.

Rothschild & Phelan, San Francisco, Cal., and Gendel, Raskoff, Shapiro & Quittner, by August B. Rothschild and Bernard Shapiro, Los Angeles, Cal., for unsecured creditors.

Chickering & Gregory, San Francisco, Cal., for Crocker-Citizens Nat. Bank, in-

denture trustee for debtor's 6½% convertible subordinated debentures.

James A. Borland, Albuquerque, N. M., Hopkins P. Breazeale, Jr., Baton Rouge, La., special counsel for trustee.

C. J. Odenweller, Jr., San Francisco, Cal., for S. E. C.

James F. Thacher, San Francisco, Cal., for objecting creditors.

## MEMORANDUM OF DECISION UPON APPLICATION FOR FINAL ALLOWANCES

### GEORGE B. HARRIS, Chief Judge.

#### Preliminary Statement

This is the epilogue of a judicial drama that has occupied the attention of this Court for a period in excess of five years.

The decision approving the plan of reorganization appears in 242 F.Supp. 561 (D.C.1965). A review of the decision will disclose a complete exposition of the interplay of the economic forces that brought about the business catastrophe in the first instance, as well as the benign and constructive forces which led to the joint plan of reorganization.[1]

The said decision disclosed that the Court appointed Frank T. Andrews as Trustee on March 21, 1962. The Trustee encountered an almost hopeless situation with all of the concomitants of insolvency present. The Court observed and found that the complete dedication, talent and industry of the Trustee in directing the affairs of the company, planning its financial program, hiring key employees, together with a complete command of the accounting aspects, in large measure made the result possible which the company presently enjoys.[2]

The Court further observed that recognition should be given to the team of lawyers headed by Burton J. Goldstein, including Ralph Golub, Austin C. Clapp and Joseph B. Purteet, representing the Trustee. The litigation which they encountered was vast, complex and demanding and required the highest degree of industry and talent. They discharged their obligation in the finest tradition.[3]

The Court further observed during the course of said opinion and decision:

When the Trustee was appointed, the proceedings under Chapter XI had been in force approximately 6½ months. Without question, the Chapter X proceedings inherited almost insurmountable operating difficulties and administrative impediments. The objective of Chapter XI was liquidation and, to that end, backlogs of work dwindled, sales efforts were curtailed and frustrated, many key employees resigned, or were terminated, collection of accounts was neglected, many vendors required cash on delivery of materials, performance bonds were obtainable only upon depositing cash with the insurer, many customers withheld or cancelled orders, job bidding was careless and haphazard, there were numerous carry-over and continuing job losses, and confusion prevailed respecting litigation, interpretation of agreements, and with product warranties. The net loss for the year 1961 was $14,106,252.[4]

Regarding the role played by the attorneys for the Creditors' and Debentureholders' Committees, the Court said:

It is significant to note that the close cooperation between the attorneys for the Trustee and the attorneys representing the Creditors' and Debentureholders' Committees and Judson Steel Corporation resulted in the achievement of the plan presently submitted to this court and denominated "Joint Plan of Reorganization of Trustee

---

1. The bankruptcy proceedings under Chapter X represented the most complex reorganization proceeding in which the Securities Exchange Commission has participated over the last 25 years. 242 F. Supp. 561 at 562.

2. The manifold duties of the Trustee are set forth in extenso commencing p. 45, Vol. I, Hearing on Plan for Reorganization. 242 F.Supp. 561 at 563.

3. 242 F.Supp. 561 at 563.

4. 242 F.Supp. 561 at 564.

Creditors and Debentureholders (Second Revised)." [5]

In view of the concerted effort of the Trustee, his attorneys, and the attorneys representing the Creditors' and Debentureholders' Committee, the Court hopefully expected that this closing chapter of the reorganization proceedings would be conducted in a happier vein, particularly in view of the magnitude of the accomplishments.

All of the major applicants for compensation have filed herein lengthy memoranda in support of their applications and submitted themselves for direct and lengthy cross-examination. The transcript alone of the hearings on compensation occupies 10 volumes with 946 pages of transcript.

Subsequent to the lengthy hearing, the Securities and Exchange Commission undertook the preparation of its memorandum on applications for compensation. Final hearings were conducted based on this memorandum and the applicants again filed lengthy and responsive memoranda wherein critical observations were made concerning the integrity of the recommendations submitted by the Commission.

Preliminary to a discussion of the memorandum of the Securities and Exchange Commission, certain general observations should be made: The Commission does not dispute any of the time records kept and maintained by the attorneys. There is no contention that any of the services were inept, unnecessary or wasteful. In fact, the transcript of the hearings on fee applications is replete with encomiums concerning the effective services rendered by the Trustee and his counsel.

Further, it should be pointed out that a misconception is generated by the memorandum as a result of considering the fees and other expenses heretofore paid under the Chapter XI proceedings as having some relevancy or materiality to the total compensation requested in the Chapter X proceedings. The result represents an unfair appraisal and misunderstanding of the total amounts requested as final fees herein.[6]

In advance of the Court's analysis of the Securities and Exchange Commission memorandum, the comments of counsel concerning the document should be reviewed.

The observations, in part, of Burton Goldstein, Esq., attorney for the Trustee:

I simply do not understand the situation in which we find ourselves so far as that report is concerned, and I and my fellow lawyers thank God that we are here before this Court as the arbiter of this problem and not before the Administrative Agency which sets itself up in some ivory tower in Washington, D. C., removed from this courtroom, and removed from the problems with which we have labored here, and removed from the personalities, and removed from the struggle and the strain and the ire and the fight and the difficulties, as well as the harmonies which have been a part of this proceeding.

They purport to say to us, "Well, gentlemen, you have done a great job here, you saved a sick patient, you were great surgeons, but basically, while we give you our compliments, we do not think that you are worthy of the hire which your status in the profession and which your hours of effort entitle you to." [7]

\* \* \* \* \* \*

Because to me it is a great travesty that when you have a case like this one which from the start seemed to be hopeless and was termed hopeless, at least by the time I came into it in January of 1963 when there was this great hue and cry for a liquidation, for an adjudication,

---

5. 242 F.Supp. 561 at 564.

6. Allowances of final fees in the Chapters X and XI heretofore paid total $597,-039.75. Thus, the pending applications and final allowances heretofore paid total $2,545,676.93, p. 9, Memorandum of the Securities and Exchange Commission on Applications for Compensation (hereinafter referred to as "SEC memo.")

7. Tr. Vol. 10, p. 852.

and where everybody was concerned, was bewildered, was perplexed as to what direction we should go, whether you could save this corporation, starting with that and then winding up where we do today with not only a reorganized company that is solid and sound and operating, not even close to being a corporate cripple, but one which has its head up in the sun of the business world today * * And mind you, Your Honor, under the circumstances of the present situation in the market, for example, where Yuba stock is going up and is up above the issuing price of April 1st of this year, when everything else is sliding down, we hope only on a temporary basis, in view of this, in view of the fact that we have done a job in which I consider an admirable way, we are now put in the position of having to come before you and literally plead with the Court to ignore the recommendation of this large government agency in Washington.[8]

\* \* \* \* \* \*

By some mechanics that I am not able to fathom, they say to Your Honor in this report, "Look at what this reorganization cost, two million and several hundred thousand dollars," and what do they put in that figure? They put in all the cost of the Chapter XI with which basically we are not concerned here. It is unfair to saddle us with those. Those were paid on court order for another purpose. They're done.

They throw in all of the administrative costs for people like consultants appointed by the Court to assist the Trustee in the beginning, Mr. Murphy, Mr. Gilmore, who all did their job in their proper place. They throw in all of the special counsel who were involved in specific litigation and did their job in their own way and place.

They throw in even the Booz, Allen & Hamilton report and their work, a $62,-000 item which has to do with the basis of the reorganization and should not be any indication of what either counsel

here or private individuals or ourselves are entitled to, nor should it be a charge against us, and I could go on and on, and Your Honor will remember that I objected to this exhibit when it was offered during the Plan hearings. And I still object, and I haven't changed my mind about that.

And it came in for a limited purpose only, not for the purpose for which it wound up in this report, but I must mention it because Your Honor should not, as we view it, charge us with the cost either of the XI or of the executive or administrative personnel or assistants, particularly when we consider that had this corporation been operated in private industry, its costs for counsel, for executive help, for administration, for vice-presidents, for engineers would have been far, far greater than it is in the capable hands of the Trustee. It is an irrelevancy. And I hope that Your Honor, in viewing it overall, will look at it in that context.[9]

\* \* \* \* \* \*

Now, that brings us to some other matters which affect all of us. It seems to us that the function of an SEC advisory report, whether it is for fees or anything else, is to assist the Court. I respectfully say that this report is an affront to Your Honor. It is of no assistance to Your Honor, because there is no basic discussion whatsoever of how fees are or should be evaluated. They are pegged so low that I would respectfully say that they are meaningless in a reasonable or fair consideration of what the decision of the Court should be.[10]

The observations of Richard Keatinge, Esq., one of the attorneys for the debtor corporation,[11] are in practically the same vein:

If I can turn for a moment now to the specific application which was filed in our behalf, as Your Honor will remember, this includes services rendered both by Keatinge and by Sterling and by the firm of Quittner, Stutman, Treister &

---

8. Tr. Vol. 10, pp. 853, 854.

9. Tr. Vol. 10, p. 855, l. 29 to p. 857, l. 6.

10. Tr. Vol. 10, p. 876, l. 1 to l. 11.

11. Tr. Vol. 10, pp. 881, 883.

Glatt. It covers 1,852 hours of services. We have requested a fee of $75,000, roughly $40.00 per hour.

The Securities & Exchange Commission has recommended a total fee for both firms of $15,000, a figure of approximately $8.10 per hour.

Mr. Quittner, also attorney for the debtor, said in part:

If the Court please, it was on March 26, 1966 that I celebrated my 40th year of admission to practice law, and as a young lawyer I was started in the bankruptcy practice, and the firm that I was with got $10.00 an hour, which in 1926 was considered fairly standard pay. Now, after some 40 years of practice and after receiving at least some favorable recognition from the bench and bar, the SEC thinks that I am worth $8.10 an hour, which I think is great progress.[12]

Next, we should consider the comments made by Bernard Shapiro, Esq. who, in association with August Rothschild, Esq., represented the Creditors' Committee:

* * * as has been said so many times before today, that we are going to be met with that $20.00 or $25.00 an hour figure that was used as some kind of measure about 25 years ago, and which hasn't been changed in the ensuing 25 or more years. A lot of things have changed in that time, but that figure doesn't seem to have changed.[13]

Walter Hoffman, Esq., whose extensive services as well as lengthy cross-examination played an important role in the evaluation hearings and the plan for reorganization,[14] had this comment to make concerning the report of the commision:

The SEC here has made a recommendation that senior counsel for applicant be paid at the rate of $8.09 per hour, and if we further consider and make an allowance for some 58 hours that were consumed in the processing of this application, we could reduce it by 10%, which comes to $7.20 per hour, and if we make a further reduction for an estimated 40% in overhead, we see where we land.

I believe, Your Honor, that the recommendation of the SEC is tantamount to an implicit finding that senior counsel for applicant should take a drastic loss, financial loss, in this case. It can't be viewed from any other light.

I was in the courtroom when Chapter XI was before this Court, and I remember Mr. Keatinge, at that time being counsel for debtor, resisted the position of the SEC that the proceedings should be moved from Chapter XI to Chapter X, and some of us will recall that momentous morning when Mr. Keatinge came into this courtroom and said he would no longer resist the move, that he would acquiesce in the position of the SEC for the movement of the proceedings from Chapter XI to Chapter X.

And I recall at some time thereafter Mr. Keatinge applied for attorneys' fees and I was present in court when Mr. Odenweller stated that he thought that $50.00 an hour was a reasonable fee for Mr. Keatinge to receive in the proceedings. At that time the financial situation of the debtor, of course, was dire and the outlook very bleak and dismal as compared with the flourishing situation now.

It is somewhat comforting to me to think that Mr. Thacher, who was quite critical of all counsel, in his memorandum of May 18, 1966 says:

"In conclusion, the rule of economy of administration means just that, and fees based on an hourly rate for partners' time for significant work in excess of $40.00 would seem questionable under the cases, regardless of what this counsel's opinion in the matter may be."

Well, at least, Your Honor, we have got a concession up to $40.00.

"Applicant stated in its application and supported the statement with tes-

---

12. Tr. Vol. 10, p. 887, l. 10–18.

13. Tr. Vol. 10, p. 896, l. 15–21.

14. 242 F.Supp. 561, 567.

timony that, absent special circumstances, a reasonable rate adopted by many lawyers in San Francisco for regular work of a senior partner or an experienced lawyer was $50.00 an hour."

We have alleged here that there are special factors why it should be increased to $75.00 per hour. The special factors being the results achieved. Secondly, the strenuous day-by-day participation in the proceedings, in the court work, and the intensive preparation for court work, examination of testimony and exhibits. And in this, applicant senior partner took the lead in the interest of the unsecured creditors.

The third factor, direct influential participation in the formulation of the Plan and an active participation in the conferences. And the final factors, financial resources of this data, and lastly, the ability of the debtor to pay, the debtor now being in flourishing circumstances.

In conclusion, I want to say, Your Honor, that lawyers are just wage earners, except we deal with the products of the mind. We want to be paid for a day's work just like any wage earner. We have families that we have to support after taxes. We don't have the advantage of capital gain devices which businessmen have.

And you ask yourself the question: What great, burning interest has the SEC in these proceedings to degrade the profession? What is their interest? Surely it can't be the interest of the trade creditors and the debentureholders who are now converted shareholders. It may as well be said that the interest of the SEC is to simply satisfy its own vanity and to be able to say, "See what I have done. See what I have done."[15]

Sidney Rudy, Esq., attorney for the debentureholders and also for Mr. Beach Soule, made the following statement:

If the court please, by way of a general reaction to the memorandum of the Securities and Exchange Commission, my comments would, of course, echo for the most part what has already been stated by other counsel. I think it is clear that the amounts proposed by the SEC to be allowed are absurdly low and indicate that the amounts were arbitrarily fixed. It is difficult to try to meet the argument of the memorandum because truly no argument is made.

There has been a recital in each case of the work that was done, and in most cases a complimentary recital, and then an abrupt conclusion that the amount to be allowed should be either 20% or 10% or 30% of what was asked for by each of the counsel.

I will not dwell on the general reaction, because I think that Mr. Goldstein and the other counsel who have spoken have covered the field quite thoroughly.

The position of Mr. Beach Soule, as Chairman of the Debentureholders' Committee, and of the counsel for the committee, is made even more difficult than that of the other applicants. They have needed only to point out to Your Honor that the amounts allowed were much too low and not appropriate to the services rendered. In our case the SEC has concluded that they find no way of separating the work of the Chairman of the Committee and the work of his counsel, and they therefore propose a joint allowance of $40,000. This compares to the total amounts requested of $110,000 for counsel and some $37,000 for Mr. Soule. I am not sure that I need to argue this point to Your Honor. I state that it is wholly inappropriate that the SEC should file a memorandum presumably prepared by an attorney or attorneys and to suggest that counsel should be placed in the position of dividing a fee with the Chairman of the Committee for the Debentureholders.[16]

At the conclusion of the hearing regarding the integrity of the SEC memorandum and on submission of the final

15. Tr. Vol. 10, p. 918, 1. 24 to p. 921, 1. 23.

16. Tr. Vol. 10, p. 922, 1. 10, to p. 923, 1. 19.

fee applications, this Court observed, in part:

Sacrifices have been made, of course, with the hopeful expectation of compensation in the ultimate end. No one could dream at the threshold of this case that the result would be as we now see it, and certainly it is not due to magic and it is not due to legerdemain; it is due to intensive service, well-disciplined service, and of course with a bit of ingenuity and resourcefulness.[17]

The foregoing excerpts, although bountiful and perhaps burdensome from the standpoint of the space occupied, represent, nevertheless, in context, the views of the attorneys and the Court concerning the recommendations made in the SEC report.

The Court has spent many trying weeks in attempting to reconcile the suggestions made by the Commission as to compensation and those requested by the attorneys, in the light of the realities of the litigation. This is not the first occasion that a United States District Court in comparable situation, has found little judicial comfort and solace in the Commission's attempt to fix by remote control and by extra-judicial process, adequate and reasonable compensation.

In In re North American Light & Power Co., 101 F.Supp. 931 (D.C.Del. 1951), affirmed, 3 Cir., 202 F.2d 638, Cert. den. Securities and Exchange Comm. v. Masterson, 346 U.S. 818, 74 S.Ct. 30, 98 L. Ed. 345, Chief Judge Leahy, speaking for the Court, refused to follow the SEC recommendations and said:

Though there is much to recommend the SEC position in fixing the figures of compensation in that the SEC, having observed the work of counsel before it, is possibly better able to appraise the value of such services than the judge to whom the question of fees is submitted on review, still, the awareness of the judiciary of the work of counsel's contribution to any particular litigation should not be ignored or underestimated. To ignore

entirely the judicial cognizance of fees would, I think, be assuming a judge has never been a practicing attorney and has never had the opportunity to acquire a legal sophistication as to the value of the toilers *per diem* in matters of corporate reorganization. (p. 935) * * * The services of an attorney—interviewing witnesses, getting evidence, doing research, planning strategy—may be highly complementary, even though 'duplicative'. In my experience at the bar and on the bench, I have observed lawyers of great talent simply sitting at the counsel table and not, apparently, engaging in the combat of litigation, yet obviously their contribution to the matter for determination, whether before an administrative agency or a court, is not without professional significance. And their contributive worth to the legal drama cannot be ignored or brushed aside by the semantics of such loose words as 'duplicative' and 'unproductive'. (p. 936)

The lengthy excerpts from the applications, the memorandum of the Securities and Exchange Commission, and the transcript seem to be justified. It would be difficult to wrench out of context segments of the position taken by the Commission and equally unfair to counsel in attempting in many instances to summerize their position. Further, it seems to the Court when the respective positions are portrayed in their essential particulars, the SEC position becomes transparent and simplified and the analysis perhaps more poignant and appealing.

I

*The standards in measuring a reasonable fee may be succinctly set forth:*

1. The time and labor required;

2. The novelty and difficulty of the questions involved;

3. The skill requisite properly to conduct the debtor's affairs;

17. Tr. Vol. 10, p. 943, l. 22, to p. 944, l. 3.

4. The professional standing, reputation, and ability of counsel;

5. The customary charges of the Bar for similar services;

6. The amount involved in the controversy; and

7. The benefits resulting from the services.

These standards have been stated in Matter of General Stores Corporation, D. C., 164 F.Supp. 130, as follows:

" ' * * * (1) The time which has fairly and properly to be used in dealing with the case; because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney demanded. (3) The skill employed in meeting that situation. (4) The amount involved; because that determines the risk of the client and the commensurate responsibility of the lawyer. (5) The result of the case, because that determines the real benefit to the client. (6) The eminence of the lawyer at the bar, or in the specialty in which he may be practicing.' " (p. 146)

■ As stated in Campbell v. Green, 112 F.2d 143 (5th Cir. 1940):

"The Court, either trial or appellate, is itself an expert on the question (of attorneys' fees) and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value." (p. 144)

In Official Creditors' Committee of Fox Markets, Inc. v. Ely, 337 F.2d 461, the United States Court of Appeals for the Ninth Circuit, in discussing the time element as a factor in determining a reasonable allowance said:

"In our view, the fallacy of the theory advanced by claimants, reflected in the testimony of their witnesses and evidently embraced by the Trial Court, is that the time element as a factor in determining a reasonable allowance was relegated to one of minor importance. We think the cases abundantly support the premise that where fees are sought by an officer of the Court under Sec. 241, the time element is of major importance, although there are other factors which may be given consideration.

In Chicago and West Towns Railways, Inc. v. Friedman, et al., 7 Cir., 230 F.2d 364, 367, the Court in discussing fee allowances under Sec. 241 (11 U. S.C.A. § 641) stated, 'Reasonable fees for such services depend largely on the hours spent and the allowance per hour.' In contrast, the Court pointed out that under Sec. 242, compensation is allowable only where 'The services must be beneficial to the estate.' To the same effect, In re Solar Mfg. Corp., 3 Cir., 206 F.2d 780, 781. See also London et al. v. Snyder, 8 Cir., 163 F.2d 621, 626; Dickinson Industrial Site, Inc. v. Cowan et al., 309 U.S. 382, 389, 60 S.Ct. 595, 84 L.Ed. 819; In re Food Town, Inc., D.C., 208 F.Supp. 139, 145. (p. 465)

\* \* \* \* \* \*

As we have shown, there is no substantial basis in the record for the fee allowance as made by the District Court. It was clearly excessive. Having so concluded, we are faced with a difficult problem of determining a reasonable fee within the contemplation of the Bankruptcy Act. Taking all pertinent factors into consideration, it is our judgment that a total award of $50,000 would be fair and reasonable. This is at the rate of $74.00 an hour for all time expended by the claimants, including Kadison's law assistant, as shown by their time sheets, or, if we accept Ely's allegation that he spent twice as much time as shown by the time sheets, this allowance for all time spent is at the rate of $62.00 an hour." (p. 470)

The wide disparity between the Commission's recommendations in the case at bar, i. e. approximately $8.10 per hour, as compared with the factors applied in the Fox Markets case is at once apparent.

The fee range approved in the Fox Markets case, supra, necessarily has a persuasive effect and material bearing upon this Court's ultimate findings regarding reasonable compensation.

Mindful of the foregoing general principles in awarding fees, the unique factual background confronting the Court in a given case must be considered, and it is not possible to single out any particular case as affording a predicate for the award. At best, the decided cases merely establish convenient guidelines.

The principal cases relied upon by the Securities and Exchange Commission to support its views as to the allowance of fees in this matter are Finn v. Childs Co., 2d Cir., 181 F.2d 431, and In the Matter of Hudson & Manhattan Railroad Company, Debtor, U.S.D.C., S.D.N.Y., 224 F.Supp. 815.

Suffice, that these cases represent an entirely different factual background from that presented in the case at bar, and they are of very little help to this Court,[18] and are readily distinguishable.

## II

## THE APPLICATIONS FOR COMPENSATION

So that there may be a full and complete exposition of the general outline of the services rendered by the attorneys and Trustee, the Court sets forth extensive excerpts from the applications, as follows:

### The Application of Frank T. Andrews, Trustee

The application of Frank T. Andrews, Trustee, supported by his testimony, in part reflects the following:

Since October 13, 1965, the date of applicant's last application for interim allowance, applicant, pursuant to Order of this Court under Section 167(1) of the Bankruptcy Act, continued to perform and carry out the duties required by said Order. In this connection, applicant continued to investigate the acts, conduct, property, liabilities and financial condition of Debtor, the operation of its business, and other matters relevant to the corporate reorganization and to the formulation of a plan therefor. Applicant has had the responsibility both of actively participating in the management of the construction, manufacturing and other businesses conducted by Debtor and its subsidiaries, and also of carrying forward his duties as Trustee with relation to the specific problems posed by the Chapter X corporation reorganization. Applicant has continuously been required to make comprehensive decisions on all phases of the management of the Debtor's business operations and to directly participate in decisions and courses of action, investigations and consultations with respect to legal problems required to be met by applicant and his legal counsel.

Reference is hereby made to the applications of Trustee filed herein on October 12, 1962, April 10, 1963, October 7, 1963, April 7, 1964, October 7, 1964, April 7, 1965, and October 13, 1965, referring to the procedures, matters in progress, and general scope of applicant's duties and activities, which are incorporated herein by reference, and applicant continued to carry out such duties and activities subsequent to September 30, 1965. On a day-to-day basis, applicant has personally conducted the business and affairs of Debtor, has conferred with his counsel and has advised persons interested in the Estate of Debtor of the course and conduct thereof, such as the Securities and Exchange Commission, interested creditors, debentureholders, and others. It is well-nigh impossible to detail the multitude of services performed by applicant, so that, by way of example only, applicant refers to the following matters which illustrate the nature of the duties and responsibilities undertaken by him and the decisions and procedures adopted by him:

(a) Reference is made to paragraph 3(a) of applicant's last prior application con-

---

18. See Memorandum of Trustee and Trustee's counsel filed August 19, 1966, p. 14, et seq.

cerning his duties in formulating and submitting a plan of reorganization.

Subsequent to the filing of applicant's last report the revised Joint Plan of Reorganization was confirmed by the Court on December 6, 1965, by Order which became final on or about January 17, 1966. During the period just mentioned applicant participated in many discussions and conferences with his attorneys, representatives of the Unsecured Creditors Committee, the Debenture Holders Committee, and others, relative to the corporate management structure which should be adopted by the reorganized corporation to provide the maximum efficiency in its operations.

During this period, also, applicant applied for and secured from the Court an Order in Aid of Consummation of the Plan of Reorganization, laying down an orderly procedure for the organization of the Board of Directors for the reorganized corporation, its consideration of various policy matters to govern the operation of the business of the reorganized corporation and generally to provide for an orderly transition from the conduct of the business of the corporation by applicant to its assumption by the Board of Directors so organized.

As a further step in the direction of the consummation of the Plan of Reorganization, applicant caused the Certificate of Incorporation of the Debtor to be amended and filed and recorded in the State of Delaware, the State under whose laws the Debtor was and is incorporated, and caused said amendment to be filed with the appropriate officials in the other States of the United States where the Debtor was qualified to do and wished to continue to do business.

Applicant, in consultation with his attorneys, prepared and submitted to the Board of Directors by-laws for the governing of the business of the corporation, which were adopted by the Board of Directors and, upon application, approved by the Court.

Several meetings of the Board of Directors have been held, during which a sub-stantial number of policy questions were discussed, an Executive Committee and a Sinking Fund Committee of the Board were created and their powers and duties delineated, the management structure of the corporation and its divisions and subsidiaries were discussed and determined upon, and, in general, all steps were taken to prepare the way for consummation of the Plan of Reorganization.

(b) The steps taken as reported in applicant's last application filed October 13, 1965, and applicant's continuing supervision and the carrying out of the plans which had been evolved resulted, during 1965, in the obtaining by Debtor of a gross volume of business of approximately $28,241,000.00, and as of the date of this application the volume of business is continuing to increase.

(c) In line with applicant's program of making a more functional, efficient and productive use of Debtor's existing plant facilities, he has continued to make improvements in production, in quality control, cost-control programs, inventory-control programs, and has supervised improvements in bidding procedures and production control.

(d) Applicant has continued to consummate advantageous sales of Debtor's non-productive assets, including the transaction reported in paragraph 3(d) (3) of applicant's last application of the sale of the real property near Fairplay, Colorado, which was sold, with the approval of the Court, for the sum of $66,600.00 in cash.

(e) Applicant has continued to make personal inspections of the plants and operations of the divisions and subsidiaries of the Debtor, conferring with management employees concerning their problems.

(f) Since the time of his application for interim allowance, applicant has continued his efforts to obtain the services of qualified administrative, sales and technical personnel in all of Debtor's divisions and subsidiaries for the purpose of developing greater efficiency and increased sales activity. As noted in paragraph 3 (d) of applicant's application for interim allowance of April 7, 1965, efforts in this

connection were made more difficult by the reluctance of qualified personnel to become employed by a corporation in bankruptcy. In addition, many individuals interviewed by applicant expressed a reluctance to become engaged by an organization whose management will change within the very near future. Nonetheless, applicant succeeded in obtaining the services of a number of qualified men to fill certain key sales, engineering and administrative positions. It is expected that these personnel changes will be reflected in improvements in efficiency, productivity and sales.

(g) In connection with his continuing duty to investigate, review, analyze, evaluate and verify claims against Debtor, applicant has conferred extensively with his staff and his general counsel.

He has personally participated in negotiation for settlement of a number of the major contingent, unliquidated or disputed claims and in this connection reports that as of the date of this application there remain, as yet undisposed of, claims totaling $227,322.00, which applicant believes will be disposed of for a substantially lesser amount.

The balance of listed contingent, unliquidated or disputed claims, amounting to $3,744,945.00, was disposed of by payments and allowances totaling $452,109.10.

In addition, counterclaims against these claimants produced $157,000.00 in cash, paid to the Trustee for and on behalf of the Debtor's Estate, so that the net cost of disposing of these disputed claims was only $295,109.10, slightly less than eight per cent of the total amount asserted by the claimants.

(h) Without specifically enumerating the details, applicant has supervised and participated in the making of decisions, of entering into contracts, in the carrying forward of Debtor's activities in all phases of the business of Debtor and its divisions and subsidiaries. Applicant has made important decisions in the fields of construction, contracts, labor relations, collections of moneys due Debtor, process-

ing and settling of law-suits and claims in which Debtor is involved, hiring and discharging personnel, accounting procedures to be followed, and financing Debtor's operations.

(i) The generally beneficial results of applicant's efforts is shown by the fact that net profits for the period January 1, 1965, to November 30, 1965, were $954,687.00, compared with estimated earnings for the purpose of considering the feasibility of the Plan of Reorganization of $697,000.00 per year.

4. In applying for final allowances and in reporting the imminence of consummation of the revised Joint Plan of Reorganization, applicant refers to the fact that on March 21, 1962, when applicant assumed his duties as Trustee, there was a great clamor on the part of many creditors and others concerned with the affairs of the Debtor corporation for immediate liquidation of the assets of the Debtor, their conversion into cash at forced sale prices and a distribution of such pittances as would remain to the creditors as a minute fraction of the moneys owed to them.

Approximately four years later, as a result of the joint efforts of applicant and his counsel and with the cooperation of those creditors who believed in the feasibility and actuality of the reorganization of the debtor, the various classes of creditors will receive in cash and securities, as provided by the Plan of Reorganization, the following percentages of the dollar amount of their claims:

| Class | Percentage |
|-------|-----------|
| 2–A | 100% |
| 2–B | 96,57735% |
| 2–C | 93.65172% |

In this connection it is to be noted that the cash to be received by the Class 2–A and Class 2–B creditors, under the Plan, will amount to approximately $20.00 per $100.00 of claim, a sum which is at least twice the amount which would have been received by these creditors in a liquidation, with no further assets or income by which the balance of their claims could be recovered.

This result has been accomplished only by the expenditure by applicant of his full time and effort in the affairs of the Debtor corporation.

5. The reasonable value of the services of applicant for the remainder of interim allowances, and as a final allowance for applicant's services, is the sum of $140,000.00, determined as follows:

(a) The sum of $60,000.00 as the remaining interim allowance for the period October 1, 1965, to and including March 3, 1966;

(b) The sum of $70,000.00 as the remaining amount heretofore requested by applicant in the several applications for interim allowances filed by him and which was not heretofore allowed by the Court. In this connection, applicant's prior applications for interim allowances have requested the total sum of $420,000.00. Allowances by Order of Court total $350,000.00, leaving a net difference for applicant's interim services for the period from March 21, 1962, to and including September 30, 1965, of the sum of $70,000.00.

(c) The sum of $10,000.00 as a final allowance for applicant's services over and above the amounts requested in subdivisions (a) and (b) of this paragraph.

With respect to the request in this paragraph for payment of the sum of $70,000.00 as the remaining amount heretofore sought for interim allowances but not previously allowed by the Court, applicant refers to the individual applications previously filed setting forth in detail the services rendered during the specific periods referred to.

The Trustee testified on direct and cross-examination in support of the foregoing application.[19]

*The SEC's observations and recommendations, in part, concerning the application of Frank T. Andrews:*

* * * In this capacity he evaluated and revamped the Debtor's production, construction and selling facilities, disposed of unprofitable operations and unnecessary real and personal property, secured necessary financing, reduced overhead, negotiated labor contracts and revised the safety program which substantially reduced workmen's compensation premiums. He was also active in the settlement and disposition of claims, although these were essentially and primarily the work of his general and special counsel, as noted hereafter. * * *

There is no doubt that the Trustee has rendered substantial and effective services in the administration of the Debtor's estate and in the resolution of the many corporate and financial problems of the Debtor. For such services the Trustee is entitled to reasonable compensation and in determining what is reasonable due recognition, among other things, should be given to the professional and executive assistance of others who have been paid for their services or who have applications on file for allowances.

As the Trustee has already received $400,000 as compensation we recommend that the amount so received be deemed the final allowance to the Trustee for all his services. This is at the rate of $100,000 per year, which we consider ample compensation for the Trustee who, in this case, served as the chief executive officer of the Debtor during the Chapter X proceeding.[20]

### The Court's Comment and Allowance

■ The Court allows as and for a final fee herein to Frank T. Andrews, Trustee, the sum of $90,000, representing reasonable compensation and payment in full for the asserted remainder of interim allowances and as a final allowance for applicant's services as said Trustee.

The Trustee as a result of his zeal and devotion to the infinite number of problems confronting him has developed this company from a hopeless "corporate cripple" to a position wherein it present-

---

19. Tr. Vol. VI, pp. 601–640.

20. SEC memo., pp. 11, 13.

ly occupies an enviable position in the financial community.[21]

It should be observed that the Trustee set up a reserve to meet the expenses incident to the discharge of the final fee applications and other expenses incident to concluding the Chapter X proceedings.

Yuba Consolidated Industries, Inc. as a result of the reorganization, is a successful operation known as Yuba Industries, Inc. It has adequate working capital, substantial assets, an excellent operating statement and substantial backlog. These circumstances, in part, distinguish the case at bar from many of those cited by the SEC and necessarily must be taken into account in determining the reasonableness of the fees applied for.

The company's progress in reorganization is reflected in the consolidated balance sheet and statement of income as of September 30, 1966. The statements demonstrate the splendid progress made by management as Yuba Industries, Inc. emerges from the trusteeship and corporate reorganization.[22]

### The Application of Burton Goldstein, Esq.

Burton Goldstein, Esq., on behalf of the attorneys representing the Trustee, has filed an application for the remainder of interim fees and for final fees. The application represents a compendium of the complex litigation disposed of and the settlements effected, the disposition of the so-called Lucas litigation of incredible complexity, together with reference to the time and effort expended in the proceedings incident to the establishment of the plan of reorganization.

It appears further, that Burton Goldstein, Esq. and his firm were acting as general counsel for the Trustee in the management and conduct of the diversified business affairs of the Debtor, and at the same time carrying out their duties to the Trustee in the Chapter X proceedings.

The applicant summarizes the request for fees under paragraph V of the application, as follows:

Reasonable fees as and for the remainder of interim allowances, and as a final allowance for applicants' services, is the

21. *Year's Outlook*—For calendar 1966, management of this recently reorganized metal product and mechanical engineering company currently expects net earnings of between $1,600,000 and $1,900,000 from sales of around $32,000,000, barring the imposition of restrictions on industry for military reasons. Estimated 1966 earnings reflect no income tax liability due to loss carryforwards. For 1965, net earnings of the company, then operating under a trusteeship, were $1,016,000 from sales of $28,241,000.

Sales for the 1966 first quarter, management estimates, rose to more than $8,000,000 from $5,346,000 a year earlier, and net profits for the 1966 period were $400,000 or better compared with $94,-000 in the first quarter of 1965 when completion of work under old contracts held down earnings.

For the remaining 9 months of 1966, management believes earnings will run between $1,250,000 and $1,500,000 from sales of approximately $24 million. With dividend requirements on preferred stock accruing this year from Apr. 1, the designated accounting date for the new com-

pany, management's estimates indicate share earnings for the common for the last 9 months of between $2.10 and $2.60 a common share. With the same preferred requirements, share earnings for calendar 1966 are indicated at between $2.80 and $3.40 on common. Earnings are based on the 503,091 shares of common and a like number of preferred authorized for distribution, although management points out the number of shares issued will be slightly under this due to cash paid for fractional share amounts.

*This Year's Earnings* improvement, management says, will result not only from higher sales, but also from plant improvements, particularly at its Tulsa facility, and from lower general overhead costs. General overhead costs won't exceed $550,000 this year, an official says, compared with about $1,500,000 in 1965 when this figure included expenses of claim settlements, consultant and other non-recurring fees. "Walker's Weekly Newsletter," April 18, 1966, p. 4365.

22. See Appendix: Balance Sheet, September 30, 1966, and Statement of Income.

sum of $489,775.00, determined as follows:

1. The sum of $79,000.00 as the remaining interim allowance for the period October 1, 1965 to and including February 28, 1966. This is based upon a reasonable interim hourly charge for the services performed by senior counsel for the Trustee, namely, Burton J. Goldstein, Ralph Golub and Austin Clapp, at the rate of $50.00 per hour, and by junior counsel for the Trustee, namely, Joseph B. Purteet, at the rate of $25.00 per hour.

2. The sum of $60,775 as the remaining amount heretofore requested by applicants in the several applications for interim allowances filed by them and which, on an hourly basis, was not heretofore allowed by the Court. In this connection, applicants' prior applications for interim allowances have requested the total sum of $600,775.00. Allowances by order of the Court total $540,000.00, leaving a net difference, on straight hourly time charges for the period from January 28, 1963 to and including September 30, 1965, of the sum of $60,775.00.

3. The sum of $350,000.00 as a final allowance for applicants' services over and above the amounts requested in subdivisions 1 and 2 of this paragraph hereinabove.

Burton Goldstein, Esq. testified on direct and cross-examination in support of the foregoing application.[23]

*The SEC Memorandum observations and recommendations:*

The applicant requests a final allowance of $1,029,775 for services rendered from the time of appointment to February 28, 1966, less $600,000 of interim allowances previously awarded, or an additional $429,775. Applicants claim to have devoted 15,760 hours of recorded time to the affairs of the Debtor, 11,434 of partners' time and 4,326 hours by an associate.

The services have been rendered primarily by three partners, Burton J. Goldstein, Ralph Golub, and Austin Clapp, and an associate, Joseph B. Purteet. The partners have had considerable experience in corporate and business law and particularly in litigation, but have not held themselves out to be experts in Chapter X proceedings. The associate, Mr. Purteet, has been practicing law for approximately six years.

The services rendered by the firm in this proceeding may be divided into three general categories:

(1) services rendered to the Trustee in furtherance of the general business activities of the Debtor, or services which a general counsel would have performed for a major corporation; (2) services in connection with lawsuits and disputes affecting the Debtor, which involve a very large docket of major litigation and objections to claims; and (3) services rendered in connection with the plan and other phases of the Chapter X proceeding.

Since April 1, 1963, the Debtor has not employed house counsel and this necessitated in the earlier stages of the proceeding the assistance of Clapp, a partner, in the office of the Debtor to assist the Trustee in day-to-day matters. For a while, Clapp spent 50% of his time in the Debtor's office until apparently the function of house counsel became less demanding and, by appropriate procedures, a considerable portion of the house counsel's functions was reduced to fairly routine matters, such as the collection of accounts receivable.

Generally, applicant's services as Trustee's counsel included, among others, negotiation of contracts and bidding procedures, patents and tax matters, mortgage and real estate transactions, the handling of licenses for the Debtor under various state statutes, and general corporate matters.

The second category of services involved the handling of substantial court litigation initiated by and against the Debtor in various parts of the country. When counsel were appointed, there were more

23. Tr. Vol. V, pp. 446–536; Vol. VI, pp. 537–601. See also, Testimony of Ralph Golub, Vol. V, p. 504 et seq.

than 20 lawsuits pending involving over $5,250,000. During the course of the proceeding, the applicants instituted a number of additional proceedings directed toward the recovery of money or assets for the Debtor. The condition of the pending litigation upon their appointment was in many respects chaotic and they were confronted with numerous deadlines which called for expeditious action to protect properly the interests of the Debtor.

The firm acquainted itself with the nature, scope, and extent of the Debtor's operations in a very short period of time after appointment. Counsel reviewed the existing legal and court files and various financial reports and records, conferred with attorneys for various parties and others, and immediately attended to matters which required prompt treatment.

Counsel handled most of the contested litigation themselves and, in addition, supervised the activities of many special counsel in various parts of the country. Counsel usually assisted special counsel in the preparation of evidence, pre-trial proceedings, negotiations, and in developing other aspects of the litigation. Counsel, separately and in conjunction with special counsel, participated in the settlement and disposition of many claims against and on behalf of the debtor. The firm's efforts reduced the Debtor's outstanding liabilities and, together with the disposition of assets, produced seven millions in cash which were thereby available to the Trustee for working capital and further debt reduction.

At the time that the applicant was appointed there were on file in the proceeding over 400 claims by general unsecured creditors totaling in excess of $17 million, which claims were disputed. Trustee's counsel examined these claims to determine their validity, and whether the Trustee should assert defenses, counterclaims or setoffs. The results of counsel's work is reflected in the settlement of over $15 million in claims for approximately $2 million, partially by payment in cash and partially by the allowance of

these claims as Class 2–A or Class 2–B unsecured claims.

During the 37 months from the time of their appointment to February 28, 1966, applicants prepared a total of 497 pleadings, some of which involved difficult substantive issues of law. More than 1,000 docket entries were made by the Clerk of the Court in the Chapter X proceeding during this period. Counsel conducted a series of examinations pursuant to Section 167(2) of Chapter X which are reported in approximately 1,200 pages of transcript. While the Trustee personally wrote his section 167(3) report, as well as the proposed plan of reorganization which he filed in October 1964, counsel advised the Trustee on these matters.

Counsel was active in the Court hearing on the plan of reorganization, which extended over 19 days, and negotiated with other parties regarding the joint plan which was subsequently confirmed by the Court. Counsel did legal research on substantial questions raised by the Trustee's plan, objections to the plan by other parties and on the joint plan. After the joint plan was approved, counsel prepared the necessary information to be sent to the creditors for voting on the plan, and, after confirmation, prepared all of the appropriate documents necessary to effectuate the provisions of the confirmed plan, such as amendments to the certificate of incorporation and the bylaws, and orders in aid of consummation.

Counsel have demonstrated a high degree of skill and competence in the services they have rendered throughout the proceeding. The reorganization of the Debtor and its continuation as a going concern is in no small measure attributable to the results obtained by the firm in the disposition and settlement of litigation and contested claims.

As noted, the firm has expended 15,760 hours of recorded time in the performance of services in the proceeding, of which about 73% is partners' time. Its request for a final allowance in the amount of

$1,029,775 (including $600,000 received in interim fees) is at the rate of $65 per hour. In the firm's periodic requests for interim allowances, the amounts were computed at the rate of $50 per hour for partners' time and $25 per hour for associate time. If, without conceding such proposed hourly amounts, we apply the two-to-one ratio to the $600,000 heretofore allowed, then, on the basis of 15,760 hours of services, the firm has been compensated at the rate of about $44 per hour of partners' time and $22 per hour for the associate. While hourly rates are not the sole determinant of the reasonable fee that may be awarded in Chapter X proceedings, they are one of the factors in making the statutory determination.

We have fully considered the substantial time that counsel have devoted to the Debtor's affairs and the effectiveness of counsels' services both in the administration of the estate and towards the financial reorganization of the Debtor. We have also taken into account the services of special counsel retained by the Trustee for purposes of litigation, and the amounts heretofore allowed to such counsel totaling $159,788. Under all the circumstances the Commission is of the view that the amount of $600,000 already awarded to the applicant represents more than adequate, and perhaps liberal, compensation for the competent and diligent services performed by this applicant.[24]

The foregoing is expositive of the tremendous number of hours expended and demonstrates a clear predicate for the final fee hereinafter allowed.

### The Court's Comment and Allowance

It would be difficult, if not impossible, to set forth *in extenso* the benefits which accrued to the estate of the Debtor as the result of the extensive legal services rendered by the attorneys for the Trustee. The summary of the Securities and Exchange Commission, at least in part, gives recognition to the intensity of their effort and purpose. The settlements accomplished on behalf of the Debtor corporation and the termination of the intensely complicated litigated matters justify the award of fees as hereinafter set forth.

■ The Court allows as and for a final fee herein to said attorneys for the Trustee the sum of $240,000, representing reasonable compensation and payment in full for the asserted remainder of interim allowances and as final allowance for applicant's legal services.

### The Applications of the Firms of Rothschild & Phelan and Gendel, Raskoff, Shapiro & Quittner, as Attorneys for the Committee of Unsecured Creditors

The applications of August B. Rothschild and Bernard Shapiro on behalf of said law firms, set forth in detail the services performed. The applicants state, in part:

The foregoing recitation is, of course, a mere summary of all of the complicated work that went into the formulation of the plan of reorganization that was confirmed in this case. No useful purpose would be served in setting these matters down in greater detail in this application, since the actual time expenditures are described in Exhibits A and B hereto and, further, a great part of the work performed by applicants is well known to the Court and to the parties and to the Securities & Exchange Commission by reason of the very manner in which the negotiations were conducted. The variety of the filed plans is reflected in the Court's records.

The applicants and the Unsecured Creditors' Committee represented the interests of the single largest interested group occupying the highest priority in the case, for all practical purposes. Applicants were therefore charged with a responsibility that is unusual in the experience of attorneys in insolvency matters, at least in this part of the country. It has been stated many times that this case, to put it conservatively, occupies a very high position both in complexity and size, as far as Chapter X proceedings are concerned. Although the plan of reorganiza-

24. SEC memo. pp. 14, 15, 16, 17, 18.

tion was confirmed in a time that is short when viewed against all of the complexities in the case, nevertheless applicants have performed their services over a period of four years, without any compensation of any kind. Applicants have no agreement for compensation, nor do they expect any compensation from any individual creditor. Applicants strongly believe that, in the light of all of these factors (the extensive period over which the services were rendered without interim payments, the size and complexity of the matters dealt with, the great responsibility placed on counsel because of the large potential losses that might be suffered by creditors, the size of the estate, and its ability to pay) the services rendered by applicants should not be compensated upon a time basis alone. In cases where only time is a factor, applicants are currently charging, for services within their specialty, from $60 to $75 per hour where such charges are made to private clients, and applicant Bernard Shapiro's firm requests such hourly rates currently in applications for fees before courts of bankruptcy in the United States District Court Central Division. (In the Northern District of California, fees in bankruptcy proceedings are normally not fixed on a time basis.) If a time basis alone were used for the hours expended by the firms of each of the applicants, a fair and reasonable fee would be the sum of $69,453.75, computed as follows:

| | | | |
|---|---|---|---|
| August B. Rothschild | 625¼ | hours at $60= | $37,515.00 |
| Bernard Shapiro | 326 | hours at $60= | 19,560.00 |
| Marvin Greene | 158 | hours at $50= | 7,900.00 |
| Philip L. Ball | 27 | hours at $50= | 1,350.00 |
| Work of other associates of Gendel, Raskoff, Shapiro & Quittner | 27 | hours at $35= | 945.00 |
| Work by associates of Rothschild & Phelan | 65¾ | hours at $25= | 1,643.75 |
| Walter G. Schwartz Tax Associate of Rothschild & Phelan | 9 | hours at $60= | 540.00 |

Nevertheless, by reason of all of the facts set forth above, the awarding of fees to applicants in this case on a time basis alone would not result in a fair and reasonable fee. When all of the foregoing facts are taken into account, applicants believe and represent that a fair and reasonable fee to applicants for services rendered during the pendency of these Chapter X proceedings is the sum of $130,000.00 (One hundred and thirty thousand dollars), and that there be refunded to them costs * * *

Messrs. Rothschild and Shapiro appeared in person at the hearings and they were subjected to lengthy direct and cross-examination and submitted testimony in support of their application.[25]

*The memorandum of the Securities and Exchange Commission reviews their application as follows:*

The Unsecured Creditors' Committee included Class 2–A and Class 2–B creditors, who are of equal rank *inter se*. The attorneys for this Committee are the firms Rothschild & Phelan and Gendel, Raskoff, Shapiro & Quittner, who are requesting a final allowance of $130,000 for services rendered during the proceeding, primarily in connection with the plan.

25. Tr. Vol. I, pp. 11–91, Testimony of August Rothschild; Tr. Vol. I, pp. 91–126; Testimony of Bernard Shapiro.

These services were rendered during the proceeding, primarily in connection with the plan. These services were rendered principally by August B. Rothschild and Bernard Shapiro, partners of their respective firms and experienced bankruptcy lawyers. Their request is based upon 1,238 hours of services. The Shapiro firm kept daily records which show a total of 538 hours of recorded time. The Rothschild firm did not maintain complete time records, but the total estimate of 700 hours was made when the application for allowances was prepared. On the basis of recorded and estimated time these applicants are requesting compensation at a rate exceeding $100 per hour.

These firms represented the official Creditors' Committee in the Chapter XI proceeding, and for services therein they received a final allowance of $10,000. They continued to represent the somewhat altered Committee in the proceeding under Chapter X. At the argument on the Commission's motion under Section 328, they urged adjudication of the Debtor rather than reorganization under Chapter X, and state that during the first year of the Chapter X proceeding they had serious doubts as to whether a reorganization was feasible.

The application states that the two firms rendered services (1) "in aid of the administration of this estate by the Trustee" and (2) in developing the reorganization plan. During the first year or so their time was spent substantially on matters of administration, which were largely attended by the Rothschild firm whose office is located in San Francisco. In the proposed division of functions it was intended that the Shapiro firm, located in Los Angeles, should render joint services with the Rothschild firm in matters of importance, but the schedule of services attached to the petition indicates that both offices were reviewing applications and petitions filed by the Trustee's counsel and others. It is stated that of the two firms the Shapiro firm made the major contribution to the plan.

Counsel attended most of the hearings under Section 167, but did not interrogate any witnesses nor was he prepared to undertake any such interrogation. Counsel attended the hearings with respect to the Lucas claim, but did not in any way actively participate in the proceeding and the settlement of this substantial claim. They read or reviewed many pleadings filed by the Trustee, such as applications for the sale of assets and confirmation thereof, for turnover orders, for employment of appraisers, accountants, management consultants and special counsel, objections to claims, interim fee requests by the Trustee and his counsel, and many others. As to all these and like matters, the record does not disclose what tangible or demonstrable benefit these services or activities produced for the administration of the Debtor's estate or its reorganization. According to the time schedule attached to the application, over 50% of counsel's time was expended on these unproductive efforts.

Certainly the major, and apparently the sole, contribution of applicants consisted in developing the plan of reorganization. Discussions with reference to the plan commenced in the Fall of 1963, and subsequently these were extended to include the chairman and counsel for the Debentureholders' Committee. Differences of opinion developed between the two committees relating, among other things, to the going-concern value of the Debtor and the type of securities to be issued. When negotiations with the Debentureholders' Committee reached an impasse, the applicants prepared and filed on November 20, 1964 a plan of reorganization on behalf of the Unsecured Creditors' Committee. This plan, like the Trustee's plan filed a month earlier, was based upon the assumption of a going-concern value of between $10.5 million and $11 million and creditors' claims of approximately $14.4 million. It provided for the issue of $2.5 million principal amount of first mortgage bonds and shares of common stock with a par value equal to the balance of the proposed going-concern value.

Since it seemed imperative that the two committees reach an agreement, negotiations were resumed during the hearing on the Trustee's and the committee plans, and applicants actively participated in these negotiations, which led to the filing of a joint plan filed on February 5, 1965 as amended on February 10, 1965. This plan as amended provided for the distribution of the same amount of cash ($1,050,000) and for the issue of preferred stock equivalent to one-half of the total enterprise value but not exceeding $5,500,000 in aggregate par value, and for the issuance of common stock for the balance in value. It recognized the subordination of the Class 2–D creditors and included provision for the distribution of all the cash and preferred stock to the Class 2–A and Class 2–B creditors. The Trustee requested certain modifications in the plan and thereafter the plan, as modified and acceptable to all parties, was filed on February 15, 1965, which plan the Court subsequently approved and confirmed.

Applicants have calculated their request first by applying an hourly rate ranging from $60 for partners' time to a $25 hourly rate for associates. On this basis the amount was $69,453.75 for about 1,238 hours, which amount, they state, would not be a fair allowance. They request $130,000, stating that such amount is justified in view of the time involved, complexity of the issues, the size of the estate and its ability to pay, and the results achieved. Implicit in these and other applications is the apparent feeling that, as the reorganization has been a signal success, those who played a part in this achievement should share generously in the reorganized Debtor's emergent affluence.

The time spent is one of several factors to be considered in awarding an allowance, but the more significant inquiry is whether the time so spent by a particular applicant has produced any beneficial results. In this connection, as noted previously, it should be stressed that over 50% of counsel's time was spent in mere attendance at hearings and in reading documents and other papers filed in the proceeding. As to these matters counsel served only as auditors and observers, and little compensation, if any at all, should or can be allowed for such unproductive services.

The size of the estate and its ability to pay are equally relevant, but Chapter X does not permit an allowance in excess of the reasonable value of services rendered merely because the reorganized debtor can afford it. The capitalization provided in the plan and the allocation of securities between prior and subordinate creditors in this proceeding have presented problems that are all too familiar in any internal reorganization under Chapter X. Such complexities as were involved in this proceeding stemmed principally from the extensive litigation, the contests over many claims, the wide dispersion of the Debtor's properties at the outset of the proceeding and the substantial sales or other disposition of assets. Applicants made little if any contribution to the resolution of the problems presented by these matters, which were and remained substantially the responsibility of the Trustee and his general and special counsel.

These applicants made a substantial contribution in connection with the plan. As noted, they prepared a plan on behalf of the Unsecured Creditors' Committee and, although they did not present or develop the supporting evidence as to valuation, some of its features were incorporated in the final plan. The discussions and negotiations with the Trustee and the debentureholder representatives, in which they actively participated, were likewise important and beneficial. We believe, in the light of the facts as summarized above, a final allowance of $30,000 to these applicants is adequate and fair. The division of this amount may be left to the judgment of the applicants.[26]

26. SEC memo. pp. 19–23.

### The Court's Comment and Allowance

The conclusion reached by the Commission that "over 50% of counsel's time was expended on these unproductive efforts," [27] is not concurred in by the Court. In this connection, the Commission stated:

The time spent is one of several factors to be considered in awarding an allowance, but the more significant inquiry is whether the time so spent by a particular applicant has produced any beneficial results. In this connection, as noted previously, it should be stressed that over 50% of counsel's time was spent in mere attendance at hearings and in reading documents and other papers filed in the proceeding. As to these matters counsel served only as auditors and observers, and little compensation, if any at all should or can be allowed for such unproductive services.[28]

It is difficult to understand how counsel could have acquainted themselves with the ramifications of the legal and factual problems confronting them without participation at the hearings. In the opinion of this court, participation at the hearings in many instances was all-important to the creditors represented by counsel. How the attorneys could understand the pending matters confronting the court without "reading the documents" is also difficult to understand. Until Court and counsel are provided with some computerized system digesting pleadings and evidentiary matter, I suppose that we will have to abide the sometimes laborious task of sitting through lengthy hearings and reading laborious pleadings and other relevant matter.[29] The Court therefore cannot consider as "dead time" 50% of counsel's time, and necessarily gives recognition to the expenditure of such time as coming within the contemplation of the duties and burdens cast upon the attorneys of record, and beneficial to the corporation.

The allowance of $30,000 suggested by the SEC cannot be justified. The applicants served their committee for a period in excess of four years and played an important role in the preparation, completion and confirmation of the Joint Plan of Reorganization. The services of applicants are admittedly secondary to the services performed by the Trustee and his attorneys. Nevertheless, applicants herein brought to the proceedings a lifetime of experience in this type of reorganization and an expertise that comes only with dedication and discipline.

The SEC has attempted to intrude the fact that the applicants received $10,000 as a final allowance in the Chapter XI proceedings. As already pointed out, the Chapter XI proceedings have no application directly or indirectly to the matters at hand.

The applicants made serious and constructive contributions in aid of the plan of reorganization and in the opinion of the Court it would be an affront to the applicants herein, as well as to the legal profession, to offer to these skilled attorneys the sum recommended by the SEC. The inherent frailty of the SEC memorandum is due to the fact that the Commission ignores the essential dynamics of the case and insists that it be fragmented in such fashion as would render it unrecognizable. The memorandum insists that each act performed be examined separately and judged separately, in a series of fragmented, disassociated, and unrelated episodes. The approach of the SEC is entirely unrealistic and appears to have been adopted in a vain attempt to demean, rather than to give recognition to the valued services of counsel.

This Court is in a far better position than the SEC to evaluate the legal services performed in this intrinsically involved and complex reorganization. The Court presided over all of the court proceedings from the time the matter came

---

27. SEC memo. p. 20.

28. SEC memo. p. 22.

29. See "Computers and Automation in Law," by Reed C. Lawlor, Journal of the State Bar of California, Vol. 40, No. 1, p. 30.

within the purview of Chapter X, and under the circumstances had and has first-hand knowledge of the quantum of the services and the value thereof.[30]

Both Messrs. Rothschild and Shapiro testified at length on the fee hearings and were subjected to lengthy cross-examination. In addition, they have filed herein a closing memorandum reflecting in minute detail the legal services performed, as well as their critical comments concerning the SEC memorandum.

In this particular case, a reasonable fee depends upon the criteria hereinbefore specifically enumerated.

■ Under the circumstances, the Court has concluded that a fair, reasonable and final fee to the applicants herein, Messrs. August Rothschild and Bernard Shapiro, on behalf of their respective firms, is the sum of $60,000. The Court further allows the sum of $927.95 in reimbursement for expenditures laid out and advanced by the firm of Rothschild & Phelan, and the sum of $1,969.87 representing costs expended by the firm of Gendel, Raskoff, Shapiro & Quittner.

*The Application of Willard L. Ellis and Harold L. Levy of the Law Firm of Ellis, Mathews & Levy and Sidney Rudy, Attorneys Representing the Debentureholders' Committee*

The applicants have filed herein a comprehensive application for attorneys' fees, supported by a time schedule reflecting 1060 hours of time expended as senior counsel. The application, in part, is as follows:

Applicants are attorneys for the Debentureholders' Committee for the holders of 5½ convertible subordinated debentures of Yuba Consolidated Industries, Inc., the Debtor herein. On or about May 1, 1962 said Debentureholders' Committee employed as Counsel, Everett A. Mathews, then a partner in the law firm of Ellis, Mathews & Levy. Thereafter and on June 26, 1962, said Everett A. Mathews on behalf of Ellis, Mathews & Levy, duly filed a statement in the above entitled proceeding pursuant to Section 210 of the Bankruptcy Act.

On February 2, 1964, said Everett A. Mathews died and thereafter Willard L. Ellis and Harold L. Levy, surviving partners of the law firm of Ellis, Mathews & Levy, continued to represent said Debentureholders' Committee in this proceeding. Continuously since May 1, 1962, Ellis, Mathews & Levy have been attorneys of record for said Debentureholders' Committee and have been active in the proceeding since that time. On January 15, 1965, Sidney Rudy was associated with Ellis, Mathews & Levy as an attorney of record for the Debentureholders' Committee and he has served actively as such continuously thereafter.

The total claims of debentureholders, whose interests have been represented by applicants, is $6,000,000.00. By reason of provisions in the debentures subordinating the claims of debentureholders to the claims of creditors accruing after March 1, 1960, it was apparent that any recovery for debentureholders made it essential:

That a fair, equitable and feasible plan of reorganization be developed that would meet Court approval;

That it be established to the satisfaction of the Court that the going concern value of Debtor be adequate in amount, so that the available values in excess of the claims having priority over the debentureholders would be sufficient to allow debentureholders to participate fairly in the potential of the corporation after reorganization.

There is no purpose in burdening the record with any review of the complexity and difficulty of the problems involved. This matter has had the devoted attention of the Court for a long period of time and the Court is thoroughly familiar with every detail.

Applicants have participated fully in the earlier proceedings and steps taken to avoid liquidation, bringing the matter to the point where feasibility of reorgani-

---

30. In re North American Light & Power Co., supra.

zation was at least a probability. The development of an acceptable plan of reorganization then involved the diverse interests of the several classes of creditors and, of course, in that connection and by reason of the subordination provisions already referred to, the question of going concern value of the corporation.

The initial valuations proposed by Booz, Allen & Hamilton, Inc., management consultants appointed by the Court, suggested the total value of $8,749,000.00 to $9,149,000.00 for the Debtor's assets, thereby minimizing the participation by debentureholders in the equity of the reorganized corporation. The priority position of the Class A Creditors, as they are defined in the plan, created extreme difficulties in evolving a stock structure and a division of stock among the classes of creditors which could secure the approval of the several classes of creditors involved. Applicants addressed themselves to the task of developing acceptable evidence of higher going concern value and to the companion task of structuring the stock of the Debtor for a plan that would protect the priority interests of the Class A Creditors and at the same time afford to the debentureholders a reasonable hope of recovery based upon the calculated potential of the Debtor.

On the matter of going concern value, evidence was painstakingly developed and presented to the Court by applicants. Going concern value was ultimately adjusted to the total amount of $12,536,000.00. The arrival at adequate going concern value was one essential factor in making possible an acceptable plan of reorganization. In a sense it was the crux of the many complex problems in this proceeding, and the efforts of counsel for the Debentureholders' Committee made an essential contribution to the settlement of the problem.

Applicants thereafter, in negotiation with representatives of the Class A and Class B creditors and with the constant cooperation of the Trustee and his counsel and representatives of the Securities & Exchange Commission, labored to produce the plan of reorganization which was ultimately approved by the Court and accepted by the creditors.

Applicants were constantly active in the proceeding and their efforts on behalf of the estate of Debtor and in the formulation of the plan of reorganization were constructive. Their services included:

(1) Exploration of prospective plans of reorganization.

(2) Preparation, proposal and filing of a Plan of Reorganization for Debentureholders' Committee which was subsequently abandoned.

(3) Participation in negotiations which ultimately led to the formulation of the Joint Plan of Reorganization of Trustee, Creditors and Debentureholders which was adopted, and in which applicants performed beneficial services both in the drafting of a plan designed to harmonize the conflicting interests of the various creditor groups and in the submission of substantive suggestions which were incorporated in the plan. These negotiations were not only time consuming, but required tact, skill and patience.

(4) Participation in the Lucas claimants' litigation which challenged the validity of the debentureholders' position in this proceeding.

(5) Active and constructive participation in the hearings on the original plan of reorganization, which included the presentation of expert testimony by Mr. Ross J. Cadenasso and the introduction in evidence of exhibits on the all important problem of going concern value of Debtor.

(6) Assistance to the attorneys for the trustee in the preparation of documents necessary to the consummation of the Joint Plan of Reorganization and support of that plan.

(7) Research and preparation and submission of an opinion letter for the Court and briefs for the National Office of the Internal Revenue Service in support of the availability of net operating loss carryovers to the Debtor after reorganization, including a conference with representatives of the Internal Revenue Service in Washington, D. C. and conferences

with counsel for the Securities & Exchange Commission.

It is unnecessary to detail the numerous meetings, Court hearings (applicants made 52 separate Court appearances), conferences and negotiations with counsel for the Trustee, the creditors and representatives of the Securities & Exchange Commission and the Internal Revenue Service, together with the preparation of numerous briefs, petitions, applications, orders, memoranda, and the writing of many letters and many telephone conversations which contributed to the results achieved in this proceeding.

Applicants submit herewith a statement showing only the number of hours recorded in their diaries as indicative of time consumed in the rendition of services by applicants in this proceeding. This statement is attached hereto and marked Exhibit A and is made a part hereof, not for the purpose of making a computation of fees on an hourly basis, but to indicate more specifically to the Court the extent and nature of applicants' participation in the various problems confronted and resolved in this proceeding.

Applicants recognize that the measurement of the value of legal services in this proceeding is related to the benefits conferred upon the Debtor from such services. In three general categories of services, applicants made major contributions of substantial benefit to the Debtor. These were:

(1) The formulation and drafting of the Plan of Reorganization.

(2) Participation in Court proceedings and presentation of evidence during the plan hearings on the problem of going concern value.

(3) The tax opinion provided to the Court in support of the plan on the important question of whether Debtor had available to it a substantial income tax loss carryover.

Applicants are entitled to the fair and reasonable value of the services rendered which were beneficial to the Debtor. Using that standard of measure, applicants respectfully submit that a fee of $110,-000.00 is a fair and reasonable fee to be allowed for services rendered in this proceeding.

In addition, applicants incurred expenses in the aggregate amount of $335.73. Attached hereto and marked Exhibit B and by reference made a part hereof is an itemization of such expenses.

In support of the foregoing, Messrs. Harold L. Levy and Sidney Rudy presented themselves for statements and testimony.[31]

*The recommendation of the Securities and Exchange Commission:*

The SEC has seen fit to deal with the attorneys for the Committee and the Committee Chairman, under one branch of their discussion.[32]

The memorandum in this regard is as follows:

The debentureholders were represented by a Committee, which was organized in April 1962, with Beach C. Soule as Committee Chairman and the firm of Ellis, Mathews & Levy as counsel for the Committee. The Ellis firm first appeared for the Committee about May 1, 1962. Initially the services of the Ellis firm were rendered by Everett A. Mathews, a partner. Upon his death in February 1964, the services were continued by Harold L. Levy, another partner. Sidney Rudy was added as co-counsel in January 1965. The attorneys request compensation of $110,000. Their time records show a record of 1,060 hours of service and on this basis their request is at a rate in excess of $100 per hour.

The Committee chairman maintained a small office with a secretary who worked half-days four days a week. He estimates about half the time was devoted to

---

31. Testimony of Harold L. Levy, Tr. Vol. III, pp. 377, et seq., Vol. IV, pp. 407, et seq.; Testimony of Sidney Rudy, Tr. Vol. X, p. 922, et seq.

32. SEC memo. p. 24.

his personal affairs and the remainder was for services of the Committee in maintaining communications with the debentureholders by correspondence or otherwise, and the preparation and mailing of 12 general letters containing information concerning the Debtor. He maintained no time records but estimates that he devoted 1,040 hours to these ministerial and routine services. He also estimates that he spent 430 hours in connection with the formulation of the plan. He requests an allowance of $25,400 for services rendered over a four-year period commencing April 1, 1962, at the hourly rate of $35 for services in connection with the plan, and $10 per hour for the other estimated 1,040 hours. He further requests reimbursement of approximately $11,000, of which $9,000 represents his estimate of overhead office expense chargeable to the estate and $2,000 for out-of-pocket disbursements for postage, supplies, printing and like items.

From his diary entries it appears that Mathews received and reviewed petitions and applications relating to the administration of the estate, such as Trustee's applications and orders thereon relating to collective bargaining agreements, sale of assets, employment of assistants and appraisers, interim fees for the Trustee and counsel, and similar matters. He also attended the examination under Section 21a but there is nothing in the record to indicate any active participation in such examination. Upon succeeding Mathews, Levy was for some months engaged in similar activities, reading and reviewing applications prepared by Trustee's counsel and the orders of the Court. He rarely appeared at any of the hearings on these matters or took a position thereon. The time records indicate that over 30% of total recorded time was devoted to such auditing and reviewing services, for which, if at all, only nominal compensation may be allowed.

The services on a plan were rendered mostly after July 1964 following the filing and release of the Booz-Allen feasibility report. In the negotiations with the Unsecured Creditors' Committee an attempt was made to reach an agreement on a going-concern value but, as noted, this first attempt was not successful. The question of valuation was of particular importance to the debentureholders. Since they were subordinate to the Class 2–A creditors, a low valuation would affect the extent of their participation in the reorganization. The Committee chairman was of the opinion that the going-concern value should be higher than that suggested by the other Committee, and Cadenasso was employed to assist in developing that issue. He was also of the view that a common stock participation was a means of realizing the full extent of their equity. The representatives of the other creditors were more interested in a security that would liquidate their claims as promptly as possible. Counsel for the Debentureholders' Committee drafted a plan which they were prepared to file. This, however, became unnecessary when an agreement was reached between the two committees, and this agreement led to the joint plan. As noted previously, the joint plan provided for cash and preferred stock, and as subordinate creditors the debentureholders were allotted a proportionate percentage of the common stock. Although the Court did not accept the valuation as presented by Cadenasso, his analysis and the Committee's effort nevertheless led to a substantial increase in the valuation by the Trustee which the Court accepted.

Ellis, a partner and an expert in taxation, also rendered services in connection with the availability of the tax loss carryover to the reorganized company. He filed one brief on this issue in this Court and another, in collaboration with the Trustee, with the Internal Revenue Service. He also presented the matter to the Internal Revenue Service in Washington, D. C. In all, about 11% of total time was devoted to this matter.

It is clear from the foregoing that the main contribution involved the plan of reorganization and that the results achieved represented the joint effort of

counsel and the Committee chairman. It is acknowledged that Soule had concluded that the initial valuation was too low (Tr. 433). He also took the leading role in the negotiations with the other creditor representatives prior to January 1965, and thereafter Rudy took over the negotiations but subject to Soule's ultimate decision (Tr. 435).

On the basis of this record, we are unable to separate the services of the Committee chairman and the work of Committee counsel with respect to the plan. Nor does it seem feasible or advisable to recommend a separate award for services that were not jointly performed, such as the services on the tax loss carryover. In the circumstances, we believe that a joint award to the Committee chairman and Committee counsel appears to be appropriate. In considering the amount thus to be allowed, we have taken into account the substantial amount of time that the Committee chairman devoted to routine services, the time that counsel devoted to matters of administration from which no benefit to the reorganization has been demonstrated.

We believe that an overall joint allowance to the Committee counsel and Committee Chairman in the amount of $40,000 would be fair and appropriate. It is reasonable to expect that the parties will reach agreement on a fair division of this recommended allowance.[33]

*The Court's Comment and Allowance*

The recommendations of the SEC in this regard must be rejected.

It is suggested by the SEC that the sum $40,000 would be fair and appropriate as a joint allowance to the Committee counsel and the Committee Chairman and that "it is reasonable to expect that the parties will reach agreement on a fair division of this recommended allowance." The attorney-applicants point out that the suggested division of fees between Beach Soule, the Chairman, and the lawyers representing the Committee, would result in an unethical practice between the attorneys and their client, Beach Soule. The attorneys in their reply to the SEC memorandum state, in part:

We submit that this treatment of the matter, apart from the gross inadequacy of the total amount, would be improper. There should in no event be a division of fees between the attorneys and a layman; the attorneys should not be placed in a position where they are negotiating with a client for an allocation of dollars allowed; and finally, there is no basis for the conclusion of convenience by the Securities and Exchange Commission that the services of the Chairman of the committee and the services of the attorneys cannot be separated for the purpose of evaluation.

Mr. Soule has carefully outlined in his application the services which he rendered and the attorneys have outlined in detail the services which they rendered. All that the memorandum has to say is that at one stage of the proceedings Mr. Soule took a leading role in negotiating with representatives of other groups as to a plan of reorganization and that when the attorneys were negotiating, it was subject to ultimate decision of their client, Mr. Soule. This does not make it impossible or even unduly difficult to separately value the services rendered.[34]

The Court agrees with the foregoing views submitted by the attorneys and proposes now to deal with the attorneys' application as distinct and solely apart from that of Beach Soule's.

▇ After a thorough review of the record, the Court finds that Messrs. Levy and Rudy, on behalf of their respective firms, performed legal services beneficial to the Debtor and to the debentureholders, particularly in the evaluation proceedings and the detailed negotiations and court proceedings, culminating in the order of this Court approving the plan. The said attorneys demonstrated an ex-

---

33. SEC memo. pp. 24, 25, 26, 27.

34. Reply of Sidney Rudy, et al., to SEC memo., p. 4.

pert knowledge of corporate organization, finance, and the tax matters growing out of the reorganization. A reasonable final fee under all of the circumstances, is the sum of $60,000. In addition thereto, the said applicants are to receive the sum of $335.73, representing costs laid out and expended.

### The Application of Beach Soule as Chairman of the Debentureholders' Committee

The application of Beach Soule provides, in part:

Applicant is the Chairman of the Debentureholders' Committee for the holders of 5½% convertible subordinated debentures of Yuba Consolidated Industries, Inc., Debtor, in the above entitled proceeding. Applicant maintains an office at 9 First Street, San Francisco, California 94105. Said Debentureholders' Committee was organized on or about April 12, 1962 and continuously thereafter said Committee acted on behalf of said debentureholders. On June 13, 1962, with 18 Powers of Attorney, said Committee duly filed its statement in compliance with Section 211 of the Bankruptcy Act.

Said Committee was at all times composed of Beach C. Soule, Chairman, Kenneth R. Rickey and Schuyler B. Henry. Said proceedings and their work was not of direct benefit to the debentureholders and the estate of the Debtor. Attached hereto and made a part hereof are Renunciations of Claim to Fees for Services and for expenses, separately executed by Kenneth R. Rickey on January 11, 1966 and Schuyler B. Henry on January 13, 1966.

Applicant has served as Chairman of the Debentureholders' Committee continuously since its organization. Prior to 1948, applicant was a major owner and director of United Engineering Co., engaged in ship construction and repair. Thereafter, he was a business consultant and a director of S & W Fine Foods. He is now serving on the Board of Directors of Nalley's, Inc., and Pioneer Pallet Company. He has had wide business and financial experience, and has acted as financial advisor to many firms, and applicant's business and financial experience has been contributed to the solution of many problems which confronted the Debtor.

During the course of the proceeding, applicant actively and diligently undertook solicitation for authority to represent debentureholders, which was a proper and necessary function of the Committee. As of February 16, 1965, which was the date of the filing of the Joint Plan of Reorganization of the Trustee, Creditors' Committee and Debentureholders' Committee, the Debentureholders' Committee held Powers of Attorney from approximately 700 individual bondholders, representing $3,510,000.00 in face amount of debentures. This representation progressively increased as the result, in large part, of applicant's services until on or about August 18, 1965 when the Joint Plan of Reorganization was submitted to the debentureholders for approval, the Debentureholders' Committee then represented $4,250,000.00, which amount was in excess of two-thirds of the $6,000,000.-00 publicly owned debentures of Debtor and over two-thirds of the total amount necessary for acceptance of the plan, and represents approximately 800 individual debentureholders.

Applicant's services over a period of almost four years were of direct benefit to the debentureholders and the estate of the Debtor. Said services included: extensive study and exploration of plans of reorganization; study of suggestions and proposals submitted by the trustee and the Creditors' Committee; participation in the negotiations which ultimately led to the formulation of a feasible plan of reorganization; participation in conferences and meetings, in this case necessarily numerous; the study of financial and factual data which was presented at the extensive hearings on the plans of reorganization, including the formulation of the plan of reorganization submitted by the Debentureholders' Committee. All

of the foregoing categories of services performed by applicant were in addition to the usual, but nonetheless necessary services performed by him as the sole active member of the Debentureholders' Committee. It is respectfully submitted that all of these many diverse, highly complicated and time consuming services were of substantial benefit to the estate.

In the performance of the services as outlined above, applicant estimates that he has expended or will continue to expend a total of 1,470 hours during the period from April 1, 1962, to and including March 31, 1966.

A reasonable allowance as and for applicant's services is $25,400.00.

Of said total amount, $15,000.00 is based upon an hourly rate of $35.00 for a conservative estimate of 430 hours of services performed that are directly attributable to the following: telephone and office conferences with his counsel, with the Trustee and his counsel, with representatives of the creditors' committees and their counsel, with representatives of the Securities & Exchange Commission, and in the study and analysis of data relating to the plans of reorganization and the various plans themselves, in negotiations in which he actively participated and in attendance at numerous Court hearings.

The remaining portion of the allowance herein requested, to-wit: the sum of $10,400.00 is based upon a rate of $10.00 per hour for an estimated 1,040 hours of personal services performed at the office maintained by applicant for the Debentureholders' Committee at 9 First Street, San Francisco, California. Applicant devoted and will continue to devote an average of one (1) hour per day in each five day work week for a total of 208 weeks in the period commencing April 1, 1962, to and including March 31, 1966, in the performance of necessary services involving voluminous correspond-ence and telephone and office conferences, in maintaining communication with debentureholders. Such services were in the area normally rendered by protective committees in Chapter X proceedings and such services resulted in direct benefit to the estate of the Debtor in facilitating the acceptance of the Plan of Reorganization.

In addition, applicant incurred expenses in the amount of $11,007.68. Attached hereto and marked Exhibit A and by reference made a part hereof, is an itemization of such expenses.

The applicant submitted himself as a witness during the course of the final fee applications.[35]

### The SEC recommendations:

The SEC's recommendations were incorporated in the segment of their memorandum dealing with the counsel for the Debentureholders' Committee, as hereinabove set forth. The Court, perforce, has rejected the recommendation for the reasons already set forth, particularly as the recommendation inextricably involves the intermingling of services performed by counsel and those performed by the Chairman of the Committee. It would be impossible to measure as between the respective parties, a fair, adequate and just award.

### The Court's Comment and Allowance

The Court finds that Beach Soule performed valuable services as the Chairman of the Debentureholders' Committee and, in addition, his services extensive as they were, redounded to the estate of the Debtor and to the debentureholders.

The Court has concluded that a reasonable fee to be paid to Beach Soule as and for final compensation is the sum of $15,000. That in addition thereto, said Beach Soule is to be reimbursed in the amount of $11,007.68 representing expenses incurred, cash advanced, office expenses and overhead incurred in the op-

35. Tr. Vol. III, pp. 365, et seq.

eration of the Debentureholders' Committee offices as more particularly set forth in Exhibit A attached to his said application.

*The Application of Athearn, Chandler & Hoffman by Walter Hoffman, Senior Partner*

The applicants set forth substantially as follows:

Applicants are attorneys of record in this proceeding for Judson Steel Corporation, the largest creditor in amount of Class 2–A creditors of debtor. Applicants make this application for an allowance of a reasonable attorney's fee for professional services hereinafter described.

Beginning November 11, 1963 and concluding February 10, 1966, applicants rendered services as attorneys in the formulation of the Plan of Reorganization of the aforesaid debtor and in its consummation.

Applicants have not received any payments for services or for costs or expenses in, or in connection with, the proceeding or in connection with the plan or incident to the reorganization from the debtor or from a corporation issuing securities or acquiring property under the plan or from any other person, nor have any such payments been promised by said debtor, a corporation or any other person. Attached hereto marked Exhibit "A" and expressly made a part of this application as an exhibit, is a transcript of the daily time records of applicants, specifying each daily item of services so rendered and the amount of time expended.

A general descriptive classification of the services so rendered is as follows:

(1) Conference meetings and telephone discussions with attorneys and representatives of the Unsecured Creditors Committee and with financial experts, relating to: rights of different classes of creditors, settlement of claims by payment of cash, debentures and stock, capitalization of debtor and formulation of a plan.

(2) Conference meetings and telephone discussions with attorneys and representatives of the Debentureholders' Committee, relating to subjects previously described, consideration of proposals and counter proposals with respect to a Plan of Reorganization.

(3) Conference meetings and telephone discussions with attorneys for the Trustee and the Trustee relating to subjects previously described and consideration of numerous proposals and counter proposals with respect to a Plan of Reorganization.

(4) Critical analysis of Trustee's Plan of Reorganization filed on October 16, 1964.

(5) Collaboration in the preparation and drafting of: the Plan filed by the Unsecured Creditors Committee and Judson Steel Corporation, in the preparation and drafting of the joint Plan of Reorganization (first plan filed February 15, 1965 and revised plan May 24, 1965), signed and filed by the Trustee, the attorneys for the Trustee, attorneys for the Unsecured Creditors Committee, attorneys for Judson Steel Corporation and the attorneys for Debenture Holders Committee, which plan as revised was finally approved by the court.

(6) Critical analysis and studies of Booz-Allen and Hamilton reports relating to the formulation of the Plan and capitalization of the debtor.

(7) Active participation in all court hearings concerning the Plan of Reorganization, in the examination of witnesses and presentation of arguments, and intensive preparation for the hearings and the study and analysis of numerous technical exhibits, research of legal authorities, preparation and presentation of affirmative evidence relating to capitalization.

(8) Critical analysis and studies of SEC reports issued in connection with the proceedings.

(9) Conferences with respect to the selection of the first Board of Directors of the reorganized debtor.

(10) Collaboration with the Trustee and attorneys for the Trustee with respect to the agenda for the first meeting of the Board of Directors of the reorganized debtor.

(11) Collaboration with attorneys for the Trustee in the drafting of amendments to the Articles of Incorporation of the reorganized debtor.

The total number of hours of services so rendered by applicants and the years when rendered is as follows:

| 1963 | – | 31.4 |
| 1964 | – | 90.5 |
| 1965 | – | 377.5 |
| 1966 | – | 22.9 |
| Total number of hours | | 522.3 |

Of the total of 522.3 hours of services so rendered, Walter Hoffman performed 437.9 hours. The remaining 84.4 hours of services were performed by the co-partners of Walter Hoffman in consultation with him, to-wit: Messrs. Edward G. Chandler, Leigh Athearn, Clark Maser and Richard Harrington.

Walter Hoffman, a graduate of the Harvard Law School (1923) and a former editor of the Harvard Law Review, has been engaged for the past 43 years in active and continuous practice of office and courtroom work, particularly specializing in matters pertaining to business.

In the performance of these services Walter Hoffman:

(1) Engaged in 17 conference meetings relating to the formulation of a Plan.

(2) Engaged in 48 telephone discussions relative to the Plan.

(3) Attended court hearings on 32 separate days.

(4) Actively participated in the hearings, in lengthy examinations of witnesses and the presentation of arguments to the Court. (See cross-examination by Walter Hoffman of the witness Cadenasso referred to by the Court in Memorandum Opinion and Order approving Joint Plan of Reorganization).

(5) Expended many hours of service and study and analysis of various plans, drafting of amendments, and analysis of voluminous materials in preparation for the examination of witnesses at the hearings and presentation of arguments.

A standard and reasonable charge, absent special considerations, adopted by many lawyers in San Francisco for usual and ordinary services by an experienced lawyer is $50.00 per hour.

Applying that standard, the charge for services herein rendered is $26,115.00 (522.03 hours times $50.00).

Because of the following special factors an additional charge for services is warranted:

(1) Successful results achieved in the formulation of the Plan despite the many adverse interests involved and complexity of problems encountered. As stated in the Memorandum Opinion of the Court, this proceeding represents the most complex reorganization proceeding in which the Securities Exchange Commission has participated over the last 25 years.

(2) Active and influential participation in all conferences and in the drafting of the Plan which was ultimately adopted by the representatives of all interests and approved by the Court.

(3) Active and strenuous day by day participation in Court hearings throughout the lengthy proceedings and intensive preparation for the examination of witnesses, presentation of evidence and courtroom arguments.

(4) Financial magnitude of the valuation of the reorganized debtor.

(5) Highly liquid position of the reorganized debtor and ability to pay reasonable charges incurred in its reorganization.

Because of the foregoing factors applicants believe and therefore allege that a reasonable valuation of services rendered herein previously described, is the sum of $39,172.00.

Mr. Walter Hoffman testified at length on direct and cross examination in support of the application.[36]

*The SEC's observations and recommendations:*

Applicant requests $39,172 for 522 hours of service rendered in connection with the plan of reorganization. About 84% of the services were rendered by Walter Hoffman, a senior partner, the balance by co-partners.

At the time the Debtor filed the Chapter XI petition, Judson Steel, with a claim of about $862,000, was represented on the Official Creditors' Committee. When the Chapter XI petition was superseded by the proceeding under Chapter X, a new Unsecured Creditors' Committee was organized but with no representation for Judson Steel, which also appeared to be a secured creditor. In addition, Judson Steel was collecting substantial amounts from customers of the Debtor and the bonding company, which amount it applied on its unsecured claim. A dispute arose between the company and the Trustee regarding the rights to the collected proceeds, and at about November 1963 the controversy was settled and, among other things, Judson Steel became a Class 2–A creditor for the balance of its unsecured claim for $530,000. Applicant was fully compensated for these services by Judson Steel.

After the settlement agreement applicant sought to join the Unsecured Creditors' Committee on behalf of his client, but, when advised that no position was available, applicant continued to appear in the proceeding solely as counsel for Judson Steel. Applicant has no arrangements for compensation from its client for services rendered thereafter, but is relying solely on an allowance from the estate to be determined by the Court.

Hoffman has been a director of Judson Steel and its general counsel for thirty years, and Judson still remained a client. He states that he took an independent course, regarding his position different from that of the other unsecured creditors (Tr. 241, 287). His position was determined largely by the special interest or needs of his client (Tr. 278), and what concerned him most in conferences with Committee representatives was the type of security to be issued to the unsecured creditors (Tr. 276). He states that Judson Steel had sold steel to the Debtor on 90-day terms, that Judson Steel was sustaining operating losses each year, and that the Debtor's default on its liability to Judson Steel for $530,000 seriously affected the latter's working capital (Tr. 241). Accordingly he urged cash for trade creditors, and if not cash then secured bonds but not income bonds, and certainly not stock (Tr. 241, 276–77), but he admits he "lost out" on these points (Tr. 276, 277). Under the joint plan, as approved by the Court, the amount of cash for distribution remained at $1,050,-000, as originally proposed by the Trustee, and preferred stock—not bonds—was to be distributed to the unsecured creditors. The preferred stock is cumulative only if earned, despite his efforts to make it fully cumulative (Tr. 277). However, having agreed to the joint plan he did not press these issues before the Court, and turned his attention to the question of valuation, as to which no agreement was reached in the conferences.

At the hearing on the joint plan Hoffman questioned the Trustee and Cadenasso, and was particularly opposed to the latter's high valuation. In the light of the allowable claims then estimated, the higher valuation as proposed by Cadenasso would provide the Class 2–A creditors a smaller percentage of the common stock equity than under the Trustee's valuation. He was also opposed to the higher-times earnings ratio adopted by Cadenasso. He reviewed the Commission's advisory report and at the subsequent hearing took particular exception to the Commission's estimate of $1,600,000 as excess working capital. In its opinion and order approving the plan the Court ac-

36. Tr. Vol. II, pp. 234, et seq.

cepted the Trustee's valuation, and the reference therein to Hoffman's examination of Cadenasso with respect to his times-earnings ratio suggested that such examination was helpful to the Court. Beyond that the effectiveness of his efforts at the hearing appears to us somewhat problematical and conjectural.

Hoffman did not himself draft any of the plans but claims credit for editing the joint plan. He states that he suggested 16 changes and that at least 7 or 8 of these were adopted (Tr. 279). Neither in his application nor at the hearing on the fee application did he specify the character and significance of the proposed changes. He has also stated that he edited the amended articles of incorporation of the reorganized Debtor, but again without any details.

Applicant's request for compensation was computed initially by applying an hourly rate of $50 to the 522 hours of the firm's services, thus arriving at a sum of $26,-115. Applicant states that because of special factors, primarily the Debtor's ability to pay, an additional charge at the rate of $25 per hour is justified, thereby increasing the request to $39,172.

As noted previously, Chapter X provides for "reasonable" compensation for services rendered, and what is reasonable depends upon the benefits these services produced. Upon a review of the services rendered by this applicant and taking into account the limited contribution of its services as disclosed by the record and particularly as noted in the Court's opinion and order, we recommend an allowance of $4,000 as reasonable compensation for this applicant.[37]

### The Court's Comment and Allowance

The delineation of the services outlined by the applicants, fortified in large measure by oral testimony under oath, would satisfy even the most casual observer that a dignified fee is warranted under all the circumstances.

The SEC's recommendation of an allowance in the amount of $4,000 is thoroughly unrealistic. They speak of a "limited contribution" of services rendered by Mr. Hoffman and his associates. The record is replete and complete with abundant and constructive service performed by the applicants. It is difficult, if not impossible, to determine the yardstick of measurement in this and other instances employed or adopted by the SEC. The only observation that would seem valid is that the SEC's representatives quite arbitrarily lopped off a very substantial sum which, in good conscience, was earned by and, under the circumstances, should be awarded to the applicants. Mr. Hoffman, in his closing memorandum objecting to the Securities and Exchange Commission's recommendation, said, in part:

The memorandum asserts:

"Upon a review of the services rendered by this Applicant and taking into account the *limited contribution* of its services as disclosed by the record and *particularly as noted* in the Court's opinion and order, we recommend an allowance of $4,000 as reasonable compensation for this Applicant." (P. 32) (italics by us)

This is a misconstruction of the Court's opinion.

The Court in the body of its opinion stated that the cross-examination of Cadenasso disclosed that the companies he selected were not as directly comparable to the reorganized Debtor as those selected by the Trustee. In support of this statement, the Court in an incidental footnote referred to the cross-examination by Walter Hoffman.

By that reference, the Court clearly was not passing judgment on the extent of the contribution of Hoffman's services. Of course, it was not an issue before the Court any more than the evaluation of services of other participating counsel was an issue before the Court.

37. SEC memo. pp. 29, 30, 31, 32.

A comparative analysis of the recommendations of the SEC expressed in terms of percentages and amounts requested is as follows:

| | Requested | Recommended | Per Cent |
|---|---|---|---|
| Ellis, Mathews and Levy, Rudy & Soule | $144,407.68 ($100 per hr. for attys.) | $42,000.00(1) | 29.08% |
| Rothschild & Gendel, etc. | $130,000.00 ($100 per hr. for attys.) | $30,000.00(2) | 23.07% |
| Athearn, Chandler & Hoffman | $39,172.00 ($75 per hr. for attys.) | $ 4,000.00(3) | 10.21% |

(1) Rate of $29.71 per hour
 (assuming 75% of joint fee payable to attorneys)
(2) Rate of $22.61 per hour
(3) Rate of $ 8.09 per hour

The hourly rate of $8.09 recommended by the SEC as compensation for applicant is for services rendered in the main by Applicant's senior partner with over 40 years' experience.

The amount requested and the amount recommended, does not include any allowance for time consumed in processing the fee application—approximately 58 hours to date. Consequently, in recognizing that factor, a further reduction of the amount recommended by approximately 10% would appear to be reasonable. From the resultant net amount of approximately $7.20 per hour for Hoffman, a further deduction must be made of an estimated 40% for office overhead.

We respectfully submit that the recommendation of the SEC is tantamount to an implicit finding that Applicant should take a drastic financial loss for having participated in these proceedings.

*The SEC was a hostile party adversary to Applicant with regard to every major issue in this proceeding.*

*Therefore, the position may justifiably be taken that the SEC is totally disqualified from making any recommendation with respect to Applicant's request for fees or in any event that little or no weight should be given to its recommendation.*

The position of the SEC with respect to Applicant may be interpreted as an attitude calculated to discourage and stifle individual creditors from actively participating in Chapter X proceedings—particularly where a creditor aggressively opposes the views of the SEC.

This is directly contrary to the underlying intent and spirit of Chapter X proceedings.

On this subject Collier says:

"Chapter X, in contrast with its predecessor, embodies the thought that the independent, individual participation of creditors and stockholders of a debtor corporation performs a useful function in reorganization, tending towards desirable 'democratization' of the proceedings and preventing the centralization of control in the hands of the reorganizers, 'inside' groups of a few powerful committees." (Collier on Bankruptcy 14th Ed., Vol. 6A, p. 976)

"Chapter X evinces an intention to afford more widespread participation in the proceeding and to compensate it accordingly. Hence the judge should endeavor to see that those who have properly rendered helpful service should be fairly compensated and reimbursed for their activity." (Collier on Bankruptcy 14th Ed., Vol. 6A, p. 912)

In this proceeding counsel for Judson was the only counsel for an individual creditor participating in the court proceedings relating to the Plan and in the formulation of the Plan.

We submit that Applicant rendered very substantial "helpful service" in accordance with the meaning of that phrase as used by Collier and for reasons previously set forth.

The compensation recommended by the SEC we submit is utterly inadequate and the attitude of the SEC here manifested, we submit, certainly may be regarded as one to stifle any participation by counsel in Chapter X proceedings— even under the extreme circumstances where only a single individual creditor assumes that role.

The recommendation of the SEC is in direct contravention to the underlying intent of Chapter X proceedings.[38]

The comparative analysis hereinabove set forth demonstrates that Athearn, Chandler & Hoffman have been relegated by the SEC to the lowest bracket of useful and beneficial service. The recommendation of $4,000 by the Commission results in an award of less than 10% of the amount applied for. Applicants in this type of litigation should not be treated as a pariah,[39] especially where the application is fortified by a substantial record of legal service performed in keeping with the highest traditions.

 A reasonable award under the circumstances as and for a final fee herein to Athearn, Chandler & Hoffman, is the sum of $26,000.

*The Application of Keatinge & Sterling, a Partnership, and Quittner, Stutman, Treister & Glatt*

The applications of Messrs. Richard H. Keatinge and Francis J. Quittner as attorneys for the Debtor corporation, and on behalf of their respective firms, re-

quest a final fee allowance of $75,000 for 1852 hours of services, of which 189 hours are estimated. The partners expended a total of 890 hours and all but 70 hours were expended personally by either Mr. Keatinge or Mr. Quittner. The remaining 773 hours were expended by the associates of Keatinge and Sterling.[40]

The applications are fortified by testimony and closing memoranda.[41]

Mr. Keatinge said, in part:

If I can turn for a moment now to the specific application which was filed in our behalf, as Your Honor will remember, this includes services rendered both by Keatinge and by Sterling and by the firm of Quittner, Stutman, Treister & Glatt. It covers 1,852 hours of services. We have requested a fee of $75,000, roughly $40.00 per hour.

The Securities & Exchange Commission has recommended a total fee for both firms of $15,000, a figure of approximately $8.10 per hour.

Now, before I discuss the specific services we have rendered, I'd like to do a little calculation, if I may, with Your Honor, and I will refer Your Honor to a few economic points or facts of life in connection with the operation of a business law office.

Mr. Goldstein has referred to the fact that costs of operation of a law office have risen substantially since the cases that have been cited, including particularly the Childs case and the Hudson-Manhattan case. I can remember when I first went to work in a law office I got approximately $150 a month. Today we pay young associates—

\* \* \* \* \* \*

Today, Your Honor, we pay associates right out of law school $750 a month to start, $800 the following January, and $850 the following July 1st, and increments going on up after that of a com-

---

**38.** Reply of Walter Hoffman, et al., to SEC memo., pp. 12, 13, 14, 15.

**39.** "Fallacies in Judicial Attitudes Toward Legal Fees in Bankruptcy," 28 Journal of Referees in Bankruptcy 10 —(Professor Charles Elihu Nadler)

**40.** See letter of August 29, 1966, supplementing the application

**41.** Testimony of Keatinge, Tr. Vol. II, p. 143, et seq.; Testimony of Quittner, Tr. Vol. II, p. 212, et seq.

parable nature. We pay these gentlemen one month's bonus, a full bonus each year; we give them three weeks' vacation each year. We have a full medical plan for these people. I think Your Honor can readily visualize just what the cost of an associate in a law office is today.

Of course, all other expenses have gone up comparably, because the secretaries, used to be you could get a good secretary for $150, $200 a month; today it is five, six hundred a month for a good, competent secretary. And these are merely examples of the types of cost increases which we have had in law offices over the past few years.

Some of us who have been in practice for a long time perhaps view these costs, these rises in costs, with alarm and concern, but nevertheless, they're facts of life and they're with us; they're things that you have to deal with in connection with operating a law office. And these are facts which I note no recognition of in the Commission's report.

\* \* \* \* \* \*

Now, I want to make it clear at the outset that we do not maintain and we are not trying to allege that our contribution to this proceeding is as substantial or as strong or as important as that of the Trustee or his counsel, and I'd like to pay tribute to the work that was done by the Trustee and his counsel in this proceeding. I think it was outstanding. I might say in passing that I had occasion to be on the periphery of the Hudson-Manhattan case. I know Mr. William Golub who happened to be the counsel whose fees were under review in that case. I would say unhesitatingly and unstintingly that Mr. Goldstein's contribution in this case far exceeded that of Mr. Golub in that case, and that the quality and the nature of the work was beyond question far above and beyond the type of work that had to be performed in the Hudson-Manhattan case, which was primarily, if I may say so, a case requiring the use of proper influence with the appropriate authorities to obtain an acquisition of the railroad by the Port Authority of New York and New Jersey. But to my mind, there is just no comparison between those two cases.

The nature of the services rendered by our firms have been set out in detail in a very lengthy application. I do not want to review this material again. We have reviewed it in detail. The SEC has commented upon it. The comments of the SEC are all favorable, but the fee result is not favorable. And this is, of course, something which it is extremely difficult for us to reconcile.[42]

Mr. Quittner observed, in part, during the closing stages of the hearings:

If the Court please, it was on March 26, 1966 that I celebrated my 40th year of admission to practice law, and as a young lawyer I was started in the bankruptcy practice, and the firm that I was with got $10.00 an hour, which in 1926 was considered fairly standard pay. Now, after some 40 years of practice and after receiving at least some favorable recognition from the bench and bar, the SEC thinks that I am worth $8.10 an hour, which I think is great progress.

\* \* \* \* \* \*

How they arrived at the $15,000, I could just say they put a lot of numbers in a hat and pulled one out.

I couldn't think of an easier method than that. There is no basis for it. If they criticised us for our work, if our work was inept or something like that, then they could say we wasted a lot of time, but they can't point out one thing we did in this case that didn't result in somebody's benefit. I think that goes for most counsel in this case.[43]

*The recommendations of the Securities and Exchange Commission:*

After a generalization of the services performed in this instance, the SEC continues:

It is well established that counsel for the Debtor are entitled to compensation for

---

42. Tr. Vol. X, pp. 883–886.

43. Tr. Vol. X, p. 887, et seq. A consideration of the total statement made by

Mr. Quittner as reported in the transcript is recommended.

services rendered but only to the extent that such services have been of benefit to the reorganization. On the basis of the record, as summarized above, it seems clear that applicants made a limited contribution to the reorganization, and for these services an allowance of $15,000 is reasonable.[44]

### The Court's Comment and Allowance

The Court has considered the applications, the supporting testimony and the record as a whole.

Mr. Keatinge brought to the Chapter X proceedings a vast amount of background information, as a result of his lengthy representation of the corporation. An expert in corporate law and organization, he participated in many of the involved transactions which later were considered in the reorganization proceedings.

As the stockholders were without formal representation, he and Mr. Quittner attempted to marshall such facts and law as would aid the stockholders. Although it was indicated at the threshold of the proceedings that there was no resulting equity for the stockholders, nevertheless the said attorneys labored diligently in this aspect of the involved controversy. Also, it must be remembered that they actively participated in the evaluation and reorganization proceedings and conducted extensive examinations.

Mr. Quittner, according to the record, has been engaged in bankruptcy practice for the whole of his career as a practicing lawyer, some 40 years. He brought to the proceedings the expertise of his lengthy practice and made significant and valuable contributions.

▮ The Court, after a fair appraisal of the record of services performed, finds that a reasonable, final fee under all of the circumstances is the sum of $40,000 to be paid to Messrs. Keatinge and Quittner on behalf of their respective firms and to be divided in such manner as may be equitable. It is further ordered that

costs and expenses laid out and expended by the firm of Keatinge & Sterling be reimbursed in the amount of $3036.18.

The Court further finds that the said services were of benefit to the reorganization.

### The Application of Ross J. Cadenasso, Financial Analyist

The Court has considered the application of Ross J. Cadenasso and the testimony in support thereof.[45] Although the Court did not accept the findings of this analyst, nevertheless applicant did perform valuable services regarding the feasibility of the proposed plan of reorganization, and the services represented a definite contribution to the plan of reorganization and were beneficial to the administration of the estate.

The SEC has approved his application for compensation for services rendered in the amount of $8475.[46]

▮ Accordingly, it is hereby ordered that the sum of $8475 be paid to Ross J. Cadenasso as and for compensation and a final allowance herein.

### The Application of C. Edward Strobel

In like manner the Court has given consideration to the application of C. Edward Strobel and to his supporting testimony. Mr. Strobel's accomplishments as a business and financial consultant are quite well established and known to this Court.[47]

Mr. Strobel served as a Trustee with distinction in the involved and extensive bankruptcy proceedings numbered 65058 in the files of this court and affecting Otis, McAllister & Co. Mr. Strobel's advice and counsel, particularly regarding the plan of reorganization, redounded to the benefit of the Estate of the Debtor, and to all parties concerned, including the Trade Creditors' Committee.[48]

The applicant in this instance requested the sum of $2800 computed at an hourly rate of $35 an hour.

44. SEC memo., p. 34.

45. Tr. Vol. III, p. 308, et seq.

46. SEC memo. p. 28.

47. In the Matter of Raphael Weill & Co., In Bankruptcy No. 82953, U.S.D.C. No. Dist. California.

48. Tr. Vol. III, p. 321, et seq.

The Securities and Exchange Commission recommended a total allowance of $2,000.[49]

The Court perceives no reason why Mr. Strobel should not be paid in the full amount as claimed. Parenthetically, it should be observed that Mr. Strobel's efforts and services were of equal dignity and help as compared to those of Mr. Cadenasso. The observations of Mr. Shapiro during the final hearings are of some interest:

As is the case, for example, of Mr. Strobel, Mr. Strobel performs a service and he gives an estimate of what he thinks it is worth. Now, this Court probably will not be able to say with any more predictability in the certainty sense what Mr. Strobel should get than anyone else should say. But what it can do is to evaluate that service and not be bound by any of the rules that have been arbitrarily set by whoever makes the policy on the writing of memoranda for the Securities and Exchange Commission.

Now, Mr. Strobel made a modest application for allowance, and I know of no reason why it should be cut at all. I have forgotten exactly how much it comes to per hour, but I do know this, that he set forth in there what he did, and those of us who participated with him know the help that he gave, and in the over-all consideration of this case, $2,800 is modest enough for the services that he performed.

And it was one of the remarkable things about Mr. Strobel that he never claimed more for himself than he was. He never said that he was an analyst or anything else. He just gave advice where advice was needed, and he helped the committee. And another thing that he was, that I don't think he held out for himself, that is, he formed a liaison between the Creditors' Committee and the Debentureholders' Committee, without which at times it would have been hard to operate. And he never claimed credit for that, but we all know that he did it and we appreciated it. And for whatever Your Honor considers it worth, I'd like to put in my word for Mr. Strobel and for the allowance that he has requested, and the purely arbitrary reduction of that by $800 is sufficiently mysterious that I ask the Court to disregard it.[50]

Accordingly, it is hereby ordered that the sum of $2800 be paid to C. Edward Strobel as and for a final compensation herein.

### The Application of Chickering & Gregory

The applicants request that a final allowance be made to them on account of legal services rendered to the Trustee under the Indenture dated March 1, 1960, between Yuba Consolidated Industries, Inc. and Bank of America National Trust & Savings Association. The period covered is from November 11, 1961 to March 3, 1966. The requested amount is $2950.

The SEC in this instance, recommends the sum of $2000.

The Court rejects the recommendation and allows the sum requested in full as and for a final fee. The Court in this regard has considered the application of said attorneys, the testimony of counsel and the memorandum of the Securities and Exchange Commission, and finds that the said sum of $2950 is a reasonable sum for the services performed.

### The Application of James A. Borland, Special Counsel for the Trustee

James A. Borland, Esq. appeared as special counsel for the Trustee in two Miller Act suits in the Federal Court in Albuquerque, New Mexico. He now seeks a final allowance of $5057.50, which includes an interim award of $2557.50, or an additional $2500. Applicant now requests final compensation for his services rendered to the Trustee and Debtor in the sum of $2500, plus 4% tax in the amount of $100.

The Securities and Exchange Commission recommends as the additional amount to be paid, the sum of $500.

49. SEC memo., p. 29.

50. Tr. Vol. X, pp. 897, 898.

■ The Court has considered the application of Mr. Borland, the comments of the SEC, and the record as a whole, and finds that a reasonable fee herein as and for final compensation is the sum of $1500, plus 4% tax in the amount of $60, making a total of $1560 as and for a final fee and allowance herein.

### The Application of Breazeale, Sachse & Wilson

#### Special Counsel for the Trustee

This matter has received the attention of the Court on several occasions, and at the request of the Securities and Exchange Commission the proceedings were reopened for further testimony.

The application of Hopkins P. Breazeale, Jr. on behalf of himself and the partnership, requests an allowance of $21,000, together with the sum of $187.90 in payment of disbursements made. Annexed to the application is a specification of the services rendered by the said special counsel. Hopkins P. Breazeale, Jr. offered himself as a witness in support of the application.[51]

The SEC commented at some length on the services and concluded as follows:

From the entire record, it would appear that practically all of the $463,000 of retentions were paid in the ordinary course as programmed by the engineers of the Highway Department in their January 1964 conferences with the Trustee's consultant. However, applicants are primarily responsible for having the overrun penalties reduced from $13,650.70 as assessed by the Bureau of Public Roads to the final figure of $5,988.15, a difference of $7,662.55. In addition, as noted, they rendered routine services by assisting in the clearing of the liens and watching over pending litigation.

No time records have been submitted by applicants. The application, dated May 28, 1966, prepared by Hopkins P. Breazeale, Jr., recites that 173 hours has been spent on direct work for the Debtor. In testimony before the Court on June 15, 1966, he stated that, since preparing the application, he had made a further review of his files and as a result increased the total number of hours to 216.[52]

The Court has considered the application, the testimony of Mr. Breazeale, the comments of the Securities and Exchange Commission and the final memorandum of Mr. Breazeale filed herein, as well as the testimony of Mr. Bailey.

■ The Court finds that the sum of $6500 as compensation for said services is reasonable, and allows the same to the firm of Breazeale, Saches & Wilson as a final allowance. It is further ordered that costs in the sum of $187.90 be allowed.

### III

The measurement of attorneys' fees ordinarily, is a difficult task, particularly in view of prevailing economic considerations. If a fair and just result has been attained with respect to the several awards set forth, then the length of this memorandum of decision may be justified.

It has been observed that the fixing of allowances is not only the most thankless task in all of the problems of judicial reorganization, it is also the most delicate.[53]

It is stimulating to note that Yuba Industries, Inc. is in a healthy financial condition and occupies in the market place a unique role of accomplishment in the history of corporate reorganization.[54]

---

51. Tr. Vol. VIII, p. 749, et seq.

52. SEC memo., p. 38.

53. Ruskin v. Griffiths, 269 F.2d 827, 833 (2nd Cir. 1959).

54. "Yuba Industries—The reorganized Yuba Industries Inc., reports net earnings of $1.2 million or $2.23 a share on sales of $16.8 million for the six months ended September 30. Nine-month operations showed earnings of $1.7 million and sales of $25 million, compared to $724,380 and $19 million respectively for the like 1965 period. President Frank T. Andrews said Yuba's order backlog on September 30 was $29 million, up 45 per cent from a year ago." Excerpt from San Francisco Chronicle Business World, October 27, 1966.

APPENDIX

SUBJECT TO AUDIT

## YUBA INDUSTRIES, INC.
## CONSOLIDATED BALANCE SHEET
### SEPTEMBER 30, 1966

ASSETS

**Current Assets**

| | |
|---|---:|
| Cash | $ 1,030,698 |
| Certificates of deposit, | |
| Treasury bills and Notes | 2,571,436 |
| Accounts receivable—Trade and other | 6,187,536 |
| Accounts receivable—Retentions | 1,406,980 |
| Reserve for bad debts | (69,288) |
| Inventories | 2,534,372 |
| Prepayments | 100,000 |
| Total Current Assets | 13,761,734 |

**Plant, Property and Equipment**

| | |
|---|---:|
| Land, buildings, machinery and equipment | |
| less accumulated depreciation | 3,845,422 |
| Mining properties less amortization | 55,647 |
| Total Plant, Property and Equipment | 3,901,069 |

**Other Assets**

| | |
|---|---:|
| Repair parts, supplies, patents, etc. | 378,055 |
| Total | $18,040,858 |

LIABILITIES

**Current Liabilities**

| | |
|---|---:|
| Notes payable—to bank | $ 39,113 |
| Accounts payable and accrued expenses | 5,785,494 |
| Total Current Liabilities | 5,824,607 |

**Capital**

| | |
|---|---:|
| Preferred stock ($10.00 par value—438,572 shares) | 4,835,720 |
| Common stock (no par value—502,713 shares) | 6,205,451 |
| *Capital surplus | 53,375 |
| | 11,094,546 |
| **Earned surplus from April 1, 1966 | 1,121,705 |
| Total Capital | 12,216,251 |
| Total | $18,040,858 |

*Discount on retirement of 19,000 shares of preferred stock.

**Earned surplus from January 1, 1966 is 1,769,414; the difference is included with the value of common stock in accordance with the Plan of reorganization.

## YUBA INDUSTRIES, INC.
## CONSOLIDATED STATEMENT OF INCOME
## SEPTEMBER 30, 1966

| | Month of SEPTEMBER | Year to Date |
|---|---|---|
| Net Sales | $2,741,376 | $25,120,377 |
| Cost of sales | 2,233,004 | 20,611,957 |
| Gross profit on sales | 508,372 | 4,508,420 |
| Over (under) absorbed overhead | (46,753) | (338,129) |
| Gross profit | 461,619 | 4,170,291 |
| Operating expenses | 299,746 | 2,660,713 |
| Operating Income (Loss) | 161,873 | 1,509,578 |
| Other Income: | | |
| Gain (loss) on sale of assets | — | (1,395) |
| Interest income | 21,411 | 43,667 |
| Rental and royalty income—Net | 9,948 | 102,836 |
| Sale of scrap | 3,327 | 56,935 |
| Sundry | (535) | 95,232 |
| Total | 34,151 | 297,275 |
| Other Deductions: | | |
| Bad debts | 500 | 7,715 |
| Interest | 36 | 9,307 |
| Sundry | 2,293 | 20,417 |
| Total | 2,829 | 37,439 |
| Net Income | $ 193,195 | 1,769,414 |
| Less income to March 31, 1966 capitalized in reorganization | | 526,126 |
| Less dividends on preferred stock | | 121,583 |
| Earned Surplus from April 1, 1966 | | $1,121,705 |
| Depreciation and amortization (included above) | $ 63,359 | $ 571,541 |